KEITH SHAPIRO, ESQ.
Illinois Bar No. 6184374
NANCY A. PETERMAN, ESQ.
Illinois Bar No. 6208120
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: 312-456-8400
Facsimile: 312-456-8435
Email: shapirok@gtlaw.com
Email: petermann@gtlaw.com

BOB L. OLSON, ESQ.
Nevada Bar No. 3783
GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
Telephone: 702-792-3773
Facsimile: 702-792-9002
Email: olsonb@gtlaw.com

*Proposed Counsel for Debtor and Debtor in Possession.*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>SHENGDATECH, INC.,<br><br>　　　　　　　Debtor.<br><br>───────────────────────<br><br>SHENGDATECH, INC.,<br><br>Plaintiff,<br><br>v.<br><br>XIANGZHI CHEN, et al.,[1]<br><br>Defendants. | Case No. BK-11-52649<br><br>Chapter 11<br><br>**Adv. Pro. No. 11-05082**<br><br>**DECLARATION OF SHELDON B. SAIDMAN IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS** |

I, Sheldon B. Saidman, hereby declare as follows:

1.     I am over the age of 18 and am mentally competent. I make this Declaration (the "Declaration"), under the penalty of perjury, in support of the commencement of the above-captioned case (the "Chapter 11 Case") and certain motions filed in connection therewith.

2.     The debtor and debtor in possession in this case is ShengdaTech, Inc. (the "Debtor"), a Nevada corporation. The Debtor manufactures a specialty additive known as nano-precipitated

---

[1]  The Defendants to this action are listed on Exhibit 1 to the complaint commencing this adversary proceeding.

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

calcium carbonate ("NPCC").  NPCC is used in a variety of products to enhance their durability and efficiency and is widely applied in the paint, paper, plastic and rubber industries and used for building materials such as PVC.

3.    I am an independent member of the Debtor's board of directors (the "Board") and have served in that capacity since 2007.  I am a member of the Debtor's audit committee (the "Audit Committee") and the Special Committee (defined below).  In addition to my experience with the Debtor, I have extensive senior executive experience and have held positions as President or Chief Operating Officer in several companies, both public and private, and served on other Boards of Directors.

4.    All facts set forth in this Declaration, except as otherwise indicated, are based on my personal knowledge of the Debtor's business and finances, information learned from my review of relevant documents and information supplied to me by other members of the Board, the Debtor's management and the Debtor's various business and legal advisors.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

5.    As discussed in greater detail below, the Debtor commenced this Chapter 11 case to safeguard assets, restructure its business operations and to allow the Debtor, through its Special Committee, to continue its ongoing special investigation into the financial affairs of the Debtor. More specifically, as part of this ongoing special investigation, the Special Committee of the Debtor's Board of Directors has determined that certain of the Debtor's financial records may have been falsified in whole or in part and that serious issues remain unanswered regarding the financial condition of the Debtor and its overall business operations.  The Special Committee continues to use its best efforts to obtain a true understanding of the Debtor's affairs, but those efforts have been thwarted by former management of the Debtor and obstructed by former management including the Debtor's former President and Chief Executive Officer and largest shareholder, Xiangzhi Chen ("Mr. Chen"), making the Special Committee's work incomplete.

6.    After consultation with the Debtor's business and legal professionals, including those retained by the Special Committee, and in an exercise of its fiduciary duties, the Special Committee was left with no choice but to remove management, including Mr. Chen as the Debtor's President

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

2

and CEO, and appoint an independent party, Michael Kang, of Alvarez & Marsal, to act as the Debtor's sole officer to (i) manage the Debtor's business operations, (ii) assist the Debtor in conducting its ongoing investigation, and (iii) restructure the Debtor's operations. The Special Committee further determined that the commencement of this Case and related TRO Motion (as defined below) was necessary in order to allow the Debtor to complete its investigation, prevent Mr. Chen and others acting in concert with him from further interfering with the Special Committee's ongoing investigation into the Debtor's affairs, safeguard assets for creditors, and reorganize the Debtor.

7.    This Declaration provides (i) a general description of the Debtor's business operations and corporate structure, (ii) a summary of the events leading to the filing of the Debtor's Chapter 11 Case, and (iii) additional support for relief the Debtor is seeking in connection with this Case, including the Debtor's Motion for Temporary Restraining Order and Preliminary Injunctive Relief (the "TRO Motion") filed simultaneously with the Debtor's Chapter 11 Petition for Relief.

I.    **Overview of the Debtor and Its Business Operations**

8.    The Debtor was organized as a Nevada corporation on May 11, 2001 under the name Zeolite Exploration Company. On March 31, 2006, the Debtor consummated a share exchange pursuant to a Securities Purchase Agreement and Plan of Reorganization with Faith Bloom Limited ("Faith Bloom"), a company formed under the laws of the British Virgin Islands, and its stockholders. As a result of this share exchange, the Debtor acquired all of the issued and outstanding capital stock of Faith Bloom in exchange for a total of 50,957,603 shares of the Debtor's common stock. The Debtor went public in late March 2006, and began trading on the NASDAQ early in 2007.

9.    Faith Bloom, which remains the Debtor's wholly owned subsidiary, is the direct parent company of the following entities formed under the laws of China: Shandong Haize Nanomaterials Co., Ltd., Shandong Bangsheng Chemical Co., Ltd., Shaanxi Haize Nanomaterials Co., Ltd., Zibo Jiaze Nanomaterials Co., Ltd. and Anhui Yuanzhong Nanomaterials Co., Ltd (the "Debtor's PRC Companies"). The Debtor's PRC Companies are the only operating entities

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

affiliated with the Debtor and conduct all of its manufacturing operations.  Attached hereto as Exhibit A is a corporate organizational chart for the Debtor and its subsidiaries described herein.

10.     Mr. Chen is the founder of Faith Bloom and its subsidiaries and serves as a member of the Debtor's Board.  Mr. Chen was also President and Chief Executive Officer of the Debtor until he was removed from those management positions on August 19, 2011.  Mr. Chen owns over 42.25% of the outstanding shares of the Debtor, making him the Debtor's largest shareholder.  On August 19, 2011, the Board of Faith Bloom was also removed, and A. Carl Mudd and Sheldon Saidman were elected as the new directors of Faith Bloom.

11.     In addition to the Debtor's management team, the Debtor also maintains a Board of Directors (the "Board") and an Audit Committee.  The Board is currently comprised of Mr. Chen and three independent directors: A. Carl Mudd, Sheldon B. Saidman and Dongquan Zhang.  Each of the independent directors has served on the Board since 2007.  This existing four member Board is hopelessly deadlocked and unable to function, given Messrs. Chen's and Zhang's refusal to participate in certain meetings of the Board, refusal to meet as a Board prior to the appointment of a fifth Board member and, to the extent meetings of the Board can be held, either votes cannot be taken (given Mr. Chen's and Mr. Zhang's refusal to vote) or the Board votes are two to two.

12.     As of August 25, 2011, the Board will be expanded to include an additional non-independent Board member, Mr. Gongbo Wang.  Mr. Wang is being appointed by 52% of the total current issued and outstanding voting stock of the Debtor, including Mr. Chen's 42.25% outstanding shares of the Debtor.  Mr. Wang is the former general manager and current vice general manager of Zibo Jiaze Nanomaterials Co., Ltd., one of the PRC Subsidiaries.

13.     Mr. Mudd, as Chairman, and Mr. Zhang serve with me on the Audit Committee, which convenes seven to ten times annually. These meetings consist of: 1) quarterly meetings, which include private meetings with the independent auditors and review of their audit reports as well as review and approval of financial statements, Form 10-Q and the Earnings Press Release and other such disclosures; 2) annual meetings, which include face-to-face meetings with the independent auditors, face-to-face meetings with the CFO and other functional senior management,

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

as well as review and approval of financial statements, Form 10-K, Internal Audit Plans, and the annual operating and capital expenditure budgets;  3) special meetings, which include review of important "open items" from prior meetings or issues needing resolution by management prior to year-end; and 4) discussions of long-term strategic plans, including projected capital requirements.

14.     The Debtor reported revenues of $102.1 million and net profits of $23.5 million in 2009.  The Debtor's only material debt obligations result from two note issuances completed in 2008 and 2010.  In 2008, the Debtor issued notes totaling $115,000,000 with an interest rate of 6.0% and a maturity of June 1, 2018 (the "6.0% Notes").  As of July 6, 2011, the outstanding principal amount of the 6.0% Notes was $25,578,000.  Interest on the 6.0% Notes is payable semiannually on June 1 and December 1.  The 6.0% Notes are convertible into shares of the Debtor's common stock at an initial conversion rate of 100.6036 shares per $1,000 principal amount of the 6.0% Notes, subject to adjustment.

15.     In 2010, the Debtor issued notes totaling $130 million (all of which remain outstanding) with an interest rate of 6.5% and a maturity date of December 15, 2015 (the "6.5% Notes" and, together with the 6.0% Notes, the "Notes").  Interest on the 6.5% Notes is payable semi-annually on June 15 and December 15.  The net proceeds to the Debtor from the 6.5% Notes were approximately $123.5 million.

16.     The completion of the offering of the 6.5% Notes was conditioned upon a certain amount of the 6.0% Notes being repurchased by the Debtor and surrendered to the 6.0% Notes' trustee for cancellation such that at least 75% of the original issuance amount of the 6.0% Notes were no longer outstanding.  Specifically, approximately $67.2 million of the net proceeds of the 6.5% Notes were to be used and in fact were used to repurchase a portion of the 6.0% Notes.

17.     The 6.5% Notes are convertible into shares of the Debtor's common stock at an initial conversion rate of 164.6904 shares per $1,000 principal amount of 6.5% Notes, subject to adjustment.  Holders of the 6.5% Notes (the "6.5% Noteholders") have the right to require the Debtor to repurchase, for cash, all or any portion of their 6.5% Notes on December 15, 2013 at a

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

5

price equal to 100% of the principal amount of the 6.5% Notes to be purchased, plus accrued and unpaid interest.

**II.    The Events Leading to Commencement of the Chapter 11 Case**

    A.    The March 2011 Report from KPMG, the Formation of the Special Committee, and the Resulting Investigation Into the Debtor's Affairs

    18.    The Debtor engaged KPMG as its independent certified public accounting firm from November 11, 2008 until its resignation on April 29, 2011.  During this period, KPMG audited the Debtor's financial statements for the fiscal years ending December 31, 2008 and 2009.  When issued, KPMG's audit report for 2008 found a material internal control weakness, but the 2009 report did not contain any adverse opinion and did not call into question any of the Debtor's accounting or financial reporting practices.  In March 2011, however, KPMG alerted the Debtor of potential serious discrepancies in its financial statements. The Debtor began an investigation into these allegations immediately thereafter with the appointment of the Special Committee, comprised of the Board's Audit Committee members.

    19.    More specifically, when auditing the Debtor's financial statements for the fiscal year ending December 31, 2010, KPMG reported discovering "potentially serious discrepancies and unexplained issues" relating to the Debtor's financial records.  On March 2, 2011, KPMG contacted and informed the Audit Committee of these potential discrepancies, and on March 3, 2011 provided written notice to the Audit Committee detailing information relating to, among other things, the inability to confirm sales amounts, sales terms, and outstanding balances; and undisclosed related party transactions. KPMG explained that it would be unable to complete its audit until these potential discrepancies and issues were resolved.

    20.    The Debtor's Form 10-K was due on March 16, 2011.  Since KPMG alerted the Debtor of its concerns only two weeks before this due date, the Debtor was unable to complete the thorough investigation necessary to properly resolve these potential issues and thereby enable KPMG to complete the audit.  Therefore, on March 17, 2011, the Debtor submitted the requisite Notification of Late Filing Form 12b-25 with the United States Securities and Exchange Commission (the "SEC").

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

21. On March 4, 2011, one day after KPMG informed the Audit Committee of the potential issues it discovered, the Debtor held a special meeting of the Board and, by Board resolution, created the Special Committee composed of the independent directors comprising the Audit Committee to oversee an internal investigation. A true and copy of the Board resolution creating the Special Committee is attached hereto as Exhibit B. The March 4, 2011 Resolution granted the Special Committee broad authority to "(i) conduct an independent review and investigation of issues identified by KPMG and any other matters the special committee deems appropriate"; (ii) "execute whatever agreements, including but not limited to engagement of independent counsel, independent accountants and other independent experts . . . as deemed necessary by the Special Committee;" (iii) "take any legal or other action(s) that the Special Committee in its sole discretion deems in the interests of the Company and its stockholders; " and (iv) to commence any "actions as may be needed to identify, collect and safeguard the Company's assets."

22. On March 7, 2011, the Special Committee engaged the law firm of O'Melveny & Myers LLP ("OMM") to conduct an independent investigation into the potential issues raised by KPMG. In turn, OMM retained PricewaterhouseCoopers LLP ("PwC") to provide forensic accounting support for its investigation. OMM commenced its investigation the following day and began preserving the Debtor's documents and records at that time by preserving and imaging relevant computers and accounting servers in China. OMM was also given access to data from KPMG.

23. Soon after the investigation began, problems began to surface, including the inability of KPMG to verify the Debtor's cash accounts. As a result of this development, the Special Committee proposed and the Board approved a resolution to transfer control of the Debtor's cash assets by consolidating excess cash into accounts over which the Audit Committee Chairman, would have signatory authority and adopting a cash control validation plan (the "Cash Control Plan"). A copy of the minutes containing the resolution and attaching the Cash Control Plan as an exhibit is attached hereto as Exhibit C.

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

24.     Further efforts to verify the Debtor's cash accounts pursuant to the Cash Control Plan were thwarted and unsuccessful.  The Special Committee instructed teams of professionals from OMM and PwC to visit financial institutions holding the Debtor's accounts in China in order verify the Debtor's cash accounts, but managers at the Debtors' PRC Companies obstructed those efforts. The Special Committee was informed that the managers stalled or otherwise attempted to derail trips to the Debtor's financial institutions; refused to cooperate with OMM and PwC; once at the banks, attempted to steer the team to specific persons at the banks, rather than permit the OMM and PwC teams to speak with other identified individuals; and when the OMM and PwC teams refused to meet with particular bank employees chosen by the managers, the managers departed and refused to assist the OMM and PwC teams.

25.     The Special Committee has also been unable to authenticate the veracity of certain U.S. certificates of deposits.  As part of the cash verification process, Mr. Chen provided photocopies of CDs allegedly held in the name of Faith Bloom, the Debtor's wholly owned subsidiary, as evidence that the Debtor had certain cash on hand.  The Special Committee has been unable to verify the authenticity of those CDs and despite making repeated requests for such information, Mr. Chen has been nonresponsive.  The Special Committee has learned that the bank which issued the CDs has been unable to verify them and, in fact, has no record of issuing them to Faith Bloom.

26.     On April 19, 2011, KPMG issued a Section 10A letter to the Debtor.  In the letter, KPMG referred to its prior correspondence regarding the discrepancies and/or unexplained issues relating to the Debtor's financial records, stated that it had not received adequate explanations addressing those issues, and found that senior management had not taken timely and appropriate remedial actions with respect those issues.  KPMG indicated that "this failure to take remedial action is expected to warrant our resignation from the audit engagement."  On April 29, 2011, KPMG formally resigned.

27.     On April 20, 2011, the NASDAQ Listing Qualification Staff (the "Staff") issued a Delisting Letter to the Debtor wherein it determined to delist the Company's securities from NASDAQ as a result of the Debtor's failure to file its 2010 Form 10-K, among other things.  The

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

Debtor appealed the Staff's decision to the NASDAQ Listing Qualifications Panel (the "Panel") and submitted a plan for compliance which included the completion of the Cash Control Plan. On June 8, 2011, the Panel determined to delist the Company's securities from NASDAQ. In its decision, the Panel cited the discrepancies found by KPMG and the Debtor's failure to complete its Cash Control Plan. Believing that the Cash Control Plan was a "critical component" of the investigation, the Panel determined that management was obstructing the Audit Committee's ability to fulfill its duties and responsibilities under Listing Rule 5603(c)(3) and Section 10A(m)(2) of the Securities and Exchange Act and were public interest concerns. The Panel decision resulted in the suspension of the Company's securities on the NASDAQ market effective with the open of business on June 10, 2011.

28.    On June 21, 2011 the Company appealed the Panel Decision to the NASDAQ Listing and Hearing Review Council (the "Listing Council"). On July 1, 2011, the Staff submitted a brief to the Listing Council in opposition. In its brief, the Staff highlighted the Debtor's failure to implement the Cash Control Plan. The Listing Council has not yet made its determination.

29.    As of this date, the Debtor's securities remain suspended from the NASDAQ market. As of this date, the Debtor has been unable to and has not fully implemented or completed the Cash Control Plan.

B.    Debtor's Payment Obligations Under the Notes and Litigation
       Filed Against the Debtor

30.    Holders of the 6.0% Notes became entitled to require the Debtor to repurchase, for cash, all or any portion of their 6.0% Notes on June 1, 2011 at a price equal to 100% of the principal amount of the 6.0% Notes to be purchased, plus accrued and unpaid interest (the "Put Right"). As of May 24, 2011, all of the eligible 6.0% Noteholders exercised the Put Right in the aggregate principal amount of $25,578,000. As of the date hereof, the Debtor has not paid and is unable to pay the 6.0% Noteholders on account of the exercise of the Put Right.

31.    As a result of the Debtor's failure to make payment in accordance with the Put Right on June 1, 2011, the Debtor was obligated to pay interest on the still-outstanding 6.0% Notes on June 1, 2011 under Section 4.01 of the 6.0% Note indenture. The Debtor failed to pay any portion

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

1   of this interest on such date, or during the 30-day grace period applicable to interest payments under

2   the 6.0% Notes indenture.  As of the date hereof, the Debtor has not made the required interest

3   payment.

4           32.     In addition, under Section 4.01 of the 6.5% Note indenture, the Debtor was obligated

5   to pay interest on the 6.5% Notes (in the amount of approximately $4.4 million) on June 15, 2011.

6   The Debtor failed to pay any portion of this interest on such date, or during the 30-day grace period

7   applicable to interest payments under the 6.5% Notes indenture.  As of the date hereof, the Debtor

8   has not made the required interest payment.  The Debtor currently owes over $155 million under the

9   Notes which it has no ability to pay.

10          33.     The disclosures made by the Debtor and KPMG, as well as the actions taken by

11  NASDAQ, have resulted in the filing of numerous lawsuits seeking damages under the securities

12  laws and other causes of action.

13          C.      Subsequent Findings From the Special Committee's Investigation Into the Debtor's
14                  Financial Condition and Business Operations

15          34.     As set forth above, since learning of the potential serious discrepancies in the

16  Debtor's financial statements in March 2011, the Special Committee has been working tirelessly

17  with various professionals to investigate the financial condition of the Debtor and its business

18  operations.  As part of that process, the Special Committee retained the international law firm of

19  Skadden, Arps ("Skadden" or "Special Committee Counsel") to work with PwC and assist with the

20  investigation.  As started by OMM and followed up by Skadden, the investigation has involved

21  company visits, interviews, and the imaging and review of accounting records and other electronic

22  data.  Skadden has provided the Special Committee with regular updates to address issues related to

23  the investigation.  Skadden and the Special Committee, however, have been unable to complete the

24  investigation because their efforts to do so have been obstructed by Mr. Chen and former managers

25  who, on information and belief, have been acting in concert with him.  Mr. Chen also has refused to

26  participate in meetings with the Board or the Special Committee, further jeopardizing the Debtor's

27  business operations and its ability to address the serious issues it is facing.

28

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

35.     Skadden's investigation, while far from complete, has determined that certain of the financial records of the Debtor may have been falsified in whole or in part and that serious issues remain unanswered regarding the financial condition of the Debtor and its overall business operations.  On August 19, 2011, Skadden presented its preliminary report and findings to the Special Committee.  In its preliminary report, Skadden detailed the investigative efforts to date, the efforts undertaken by Mr. Chen and others to obstruct and hinder the Special Committee's investigation, and confirmed material irregularities and/or inaccuracies in the financial records of the Debtor.  Among other things, the report calls into serious question the accuracy of payments allegedly made to the Debtor by various customers or the sales allegedly made, transactions the Debtor is reported to have engaged in with related parties owned by Mr. Chen which have not been supported, and suggests that sales are vastly overstated.

### III.    Recent Actions by the Special Committee and the Immediate Need for Judicial Relief

36.     As a result of the serious issues affecting the Debtor, the information uncovered during the Special Committee's investigation and the ongoing interference from Mr. Chen and others within the Debtor's management, the Special Committee determined that it was necessary to remove all management of the Debtor, including Mr. Chen from his positions as President and Chief Executive Officer of the Debtor, and to appoint an independent party to oversee the Debtor's business and assist the Special Committee with its ongoing investigation and assist with safeguarding and protecting assets for the Debtor's creditors in order to restructure and repay such obligations.

### A.    Retention of Chief Restructuring Officer

37.     By resolution dated August 19, 2011, and pursuant to the authority vested in it on March 4, 2011, the Special Committee removed Mr. Chen from his management positions and appointed a Chief Restructuring Officer ("CRO"), whose responsibilities include working with the Special Committee to investigate the discrepancies in the Debtor's financial records, including verifying the Debtor's cash accounts and tracing any funds that appear to have been moved out of the Debtor's accounts to certain of its China subsidiaries.  The CRO's responsibilities also include working with the Noteholders, other creditors and shareholders to attempt to achieve a consensual

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

resolution of the Debtor's outstanding obligations.  The Special Committee selected Michael Kang of Alvarez & Marsal North America LLP ("A&M") to serve as CRO.  A copy of the August 19, 2011 Resolution is attached hereto as Exhibit D.

38.    The Debtor requests that this Court confirm the employment of A&M to provide a CRO and other personnel as necessary, and to confirm the appointment of Mr. Kang as CRO for the Debtor (the "CRO Application").  It is clear that the Debtor needs an independent manager in place to manage its restructuring process and assist the Special Committee with its on-going investigation, in addition to overseeing the Debtor's day-to-day business and prosecuting this Chapter 11 Case.  A&M and Mr. Kang fulfill that need.

39.    A&M in general, and Mr. Kang, in particular, have extensive experience helping financially troubled companies work through their restructuring processes.  A&M's debtor services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including developing or validating forecasts and business plans and related assessments of a business's strategic position; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages, and conducting forensic investigations.  Further, Mr. Kang has substantial knowledge and over 15 years' experience serving in either senior management positions or as a restructuring advisor in large companies and in assisting troubled companies with stabilizing their financial condition, analyzing their operations and developing an appropriate business plan to accomplish the necessary restructuring of their operations and finances. Moreover, A&M has restructuring professionals on the ground in China, which will prove critical to the success of this case.

40.    Based on the allegations of wrongdoing levied at them, the Debtor's former management is incapable of heading the Debtor's reorganization process or working with the Special Committee to investigate those allegations.  The Special Committee has neither the mandate nor the capability to take over management of the Debtor and conduct the Chapter 11 Case without the help of a CRO.  Given the complex issues presented in this case, the Special Committee, on

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792.3773
(702) 792-9002 (fax)

1    behalf of the Debtor, in its business judgment, determined the appropriate course of action was to

2    seek to retain A&M and Mr. Kang.

3        41.    Along with Mr. Mudd, I have reviewed the Motion to confirm the appointment of the

4    CRO and A&M and the related engagement letter with A&M.  I am generally familiar with their

5    contents.  The relief requested in the Motion is necessary to ensure that the Debtor has an

6    independent party in place to oversee management of the Debtor's business, work with the various

7    parties in interest to move forward with the Debtor's restructuring and assist the Special Committee

8    with its investigation.  Approval of the Motion is in the best interest of the Debtor, its creditors and

9    other parties in interest, and vital to the success of the Debtor's reorganization.

10       B.    TRO Motion

11       42.    The Special Committee has further determined that the successful reorganization of the

12   Debtor depends upon the resolution of this Chapter 11 Case and the Court's entry of the relief requested

13   by the Debtor in its TRO Motion.  The TRO Motion seeks to maintain the existing composition of the

14   Special Committee and the CRO, to keep the Special Committee and CRO's composition intact

15   throughout these proceedings with the powers granted to them by the Debtor pursuant to the March 4,

16   2011 Resolution and the August 19, 2011 Resolution.  The need for this relief has become even more

17   imminent given the recent actions by Mr. Chen to change the composition of the Debtor's Board, the

18   effect of which could be used to further hinder or end the Special Committee's ongoing investigation

19   and/or allow him to replace the Special Committee with new members acting under his direction or

20   control.

21       43.    Specifically, although Mr. Chen has been removed from his management positions by

22   virtue of the resolution passed by the Special Committee, Mr. Chen remains the largest shareholder

23   of the Debtor and continues to be vested with all of the rights associated with a controlling

24   shareholder.  On July 28, 2011, Mr. Chen and four other stockholders of the Debtor -- collectively

25   with Mr. Chen representing approximately 52% of the total current issued and outstanding voting

26   stock of the Debtor -- delivered written consents expressing an intent to appoint Mr. Gongbo Wang

27   to a currently vacant position on the Debtor's Board of Directors.  The effective date of Mr. Chen's

28   hand-picked selection of Mr. Wang as a member of the Board is August 25, 2011.  That

appointment -- coming on the heels of the conclusion of the initial phase of the Special Committee's ongoing investigation which directly implicates Mr. Chen as being responsible for the serious problems facing the Debtor -- would materially change the current composition of the Board and assuming Mr. Wang's anticipated cooperation with Mr. Chen, potentially empower Mr. Chen with the votes needed to remove the members of the Special Committee, change the course of the ongoing investigation, and impede the efforts of the Special Committee to ensure a successful reorganization.

44.     An order approving the Special Committee's and CRO's composition and authority and keeping them intact throughout these proceedings is also necessary for the Debtor to operate effectively during these proceedings.   The existing four-member Board, which includes Mr. Chen and Dongquan Zhang, is hopelessly deadlocked and unable to function.   Messrs. Chen and Zhang refuse to participate in meetings with the Board and have already informed the Board that they will not participate in any meetings until Mr. Wang is approved as a new member of the Board.   I and Mr. Mudd refuse to accede to these demands and without the participation of Mr. Chen or Mr. Zhang, the Board is unable to reach a quorum and address any of the serious issues which must be addressed and remedied as part of this Chapter 11 Case.

45.     I have reviewed the TRO Motion and am generally familiar with its contents.   The relief requested in the Debtor's TRO Motion is narrowly tailored and necessary to prevent Mr. Chen and others from adversely affecting the Debtor or jeopardizing its reorganization.   Approval of the TRO Motion is in the best interest of the Debtor, its creditors and other parties in interest, and vital to the success of the Debtor's reorganization.

## IV.    Conclusion

46.     The primary purposes of the Debtor's Chapter 11 Case are (i) to restructure the Debtor's business operations and (ii) allow the Debtor through its Special Committee to continue its ongoing special investigation into the financial affairs of the Debtor and the actions which occurred under the direction of former management, including the Debtor's former President and Chief Executive Officer and largest shareholder, Mr. Chen.

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)

47.    To preserve the value of its businesses to the fullest extent possible, the Debtor's immediate objective is to keep the Special Committee intact and vested with the full power and authority it was given by the Debtor pursuant to the March 4, 2011 Resolution so that the Special Committee can complete its ongoing investigation, control the business operations of the Debtor going forward, prosecute this Chapter 11 Case to conclusion, and ensure that the Debtor's restructuring will not be interfered with during the course of these proceedings, all with the help of the CRO.  For the reasons described herein, the prospects for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in the TRO Motion and CRO Motion and thus the Court is respectfully requested to do so forthwith.  This relief is designed to enhance the recoveries that would ultimately be available for creditors herein.

1    Executed this 20th day of August 2011, at Colorado Springs, Colorado.

2

3                                                    SHELDON B. SAIDMAN

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Greenberg Traurig, LLP
3773 Howard Hughes Parkway, Suite 400 North
Las Vegas, Nevada 89169
(702) 792-3773
(702) 792-9002 (fax)