JOHN F. MURTHA, ESQ.
**Nevada Bar No. 835**
WOODBURN AND WEDGE
Woodburn and Wedge
6100 Neil Road, Suite 500
Reno, Nevada 89511

Phone: (775) 688-3016
Fax:    (775) 688-3088
Email:  jmurtha@woodburnandwedge.com

Local Counsel For Plaintiff

STUART M. GRANT, ESQ.
**Delaware Bar No. 2526**
MEGAN D. McINTYRE, ESQ.
**Delaware Bar No. 3307**
CHRISTINE M. MACKINTOSH, ESQ.
**Delaware Bar No. 5085**
GRANT & EISENHOFER P.A.
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801
(Pro Hac Vice Applications to be Filed)

Telephone: (302) 622-7000
Facsimile: (302) 622-7100
Email:  mmcintyre@gelaw.com

Counsel for Plaintiff

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| IN RE: | Case No. BK-11-52649-BTB_ |
| SHENGDATECH, INC., | Chapter 11 |
| Debtor. | Adversary No. _____ |
| | |
| SHENGDATECH LIQUIDATING TRUST, | COMPLAINT |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| HANSEN, BARNETT & MAXWELL, P.C.; BAKER TILLY INTERNATIONAL LIMITED; KPMG INTERNATIONAL COOPERATIVE; and KPMG LLP, | Hearing Date (Adv. Sched. Conf.): Hearing Time: Estimated time for hearing: |
| Defendants. | |

Plaintiff ShengdaTech Liquidating Trust (the "Liquidating Trust" or "Plaintiff"), by its undersigned attorneys, alleges the following upon personal knowledge as to itself, and upon information and belief as to all other matters. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.    Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it is related to a case under title 11, namely, *In re ShengdaTech, Inc.*, Case No. BK-11-52649-BTB (Bankr. D. Nev.) (the "Bankruptcy Proceeding").

2.    Additionally, on October 2, 2012, this Court entered an order in the Bankruptcy Proceeding confirming the First Amended Chapter 11 Plan of Reorganization, As Modified (the "Plan of Reorganization") of ShengdaTech, Inc. ("ShengdaTech").  The Plan of Reorganization expressly provides that this Court retains exclusive jurisdiction over all matters arising out of, and related to, the Bankruptcy Proceeding to the fullest extent permitted by law, including jurisdiction to "hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters."

3.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a) because this action is related to the Bankruptcy Proceeding pending in this Court.

4.    Venue is also appropriate in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and/or 1391(b)(3) because each of the Defendants is subject to personal jurisdiction in this District and is deemed to reside in this District.  By agreeing to serve as an auditor of ShengdaTech, a Nevada corporation, defendant Hansen, Barnett & Maxwell, P.C. ("Hansen") has purposefully established sufficient contacts with Nevada to confer personal jurisdiction over it with respect

2

to claims arising from its service as such. Hansen has further subjected itself to the jurisdiction of this Court by acting as an ordinary course professional to the debtors and asserting an informal proof of claim in the Bankruptcy Proceeding in its declaration supporting its retention as an ordinary course professional [Docket No. 208]. Defendants Baker Tilly International Limited, KPMG International Cooperative, and KPMG LLP conduct business, either directly or through their member firms, in this District and have earned substantial revenue as a result of such business. Plaintiff's claims arise out of actions taken by the Defendants, either directly or through their member firms, in connection with services these member firms, including KPMG LLP, provided to ShengdaTech, a Nevada corporation, and for which they earned substantial revenue.

5.    This adversary proceeding contains both core and non-core claims. Plaintiff consents to entry of a final order by the bankruptcy judge.

**II.    NATURE OF THE CASE**

6.    ShengdaTech, a company incorporated in Nevada that conducted its operations in the People's Republic of China, has spiraled into bankruptcy following the revelation of serious discrepancies in its financial records. Those discrepancies are, in large part, the result of a few members of ShengdaTech management manipulating the books to conceal their looting of the Company for their own personal pecuniary gain. ShengdaTech's Liquidating Trust, as the successor to the now-defunct ShengdaTech's legal claims, is now in the process of marshaling what few assets remain for distribution to the Company's creditors. Through this action, the Liquidating Trust seeks to recover from the well-compensated auditing firms who, through negligence and in breach of their contracts with ShengdaTech, failed to uncover this looting and put a stop to it.

7.    The non-management directors on ShengdaTech's Board of Directors (the "Board") – who constituted a majority of the five-member Board – had no knowledge of management's wrongdoing, and relied on Defendants to ferret out

fraud or manipulation of the Company's financial statements through their audits of the Company's financial statements and internal controls. When Defendants issued clean audit opinions on the Company's financial statements, the Board relied on those opinions and caused the Company to publish those financial statements in filings with the Securities Exchange Commission ("SEC") and to issue securities to the investing public based on those financial statements. Additionally, by virtue of Defendants' clean audit opinions, the Board did not question the integrity of management or put into place any additional checks on management's conduct. The Company's shareholders, likewise, relied on Defendants' audit opinions when deciding to purchase or continue to hold the Company's stock.

8. When the Board and investors were finally alerted in 2011 to the discrepancies in ShengdaTech's financial records, the Company swiftly collapsed. As a result of Defendants' negligence and breach of contract, ShengdaTech suffered substantial harm, including, but not limited to: (1) paying auditing fees for services that were not competently performed; (2) incurring legal expenses and potential liabilities by virtue of its having published false financial statements; and (3) incurring substantial costs in investigating the wrongdoing that Defendants' negligence and breach of contract had helped conceal.

9. Plaintiff brings this action against: (1) Hansen, Barnett & Maxwell, P.C. ("Hansen"), one of ShengdaTech's former auditors; (2) Baker Tilly International Limited ("Baker Tilly"), the global firm of which Hansen is a member, on a *respondeat superior* theory of liability; (3) KPMG International Cooperative ("KPMG International"), the global firm of which ShengdaTech's former auditor KPMG HK[1] is a member, on a *respondeat superior* theory of

---

[1] Because ShengdaTech's engagement letter with KPMG HK contained an alternative dispute clause, the Liquidating Trust has not named KPMG HK as a defendant here but, rather, is pursuing relief against KPMG HK in an alternate forum. KPMG HK's misconduct is alleged herein only to provide a basis to impose liability on KPMG International and KPMG USA.

liability; and (4) KPMG LLP ("KPMG USA"), the United States member of firm of KPMG International that controlled KPMG HK with respect to its audits of ShengdaTech, on a *respondeat superior* theory of liability.

10.    During all times relevant hereto, Hansen was a member of Baker Tilly, a global network of accounting firms with member firms located in 131 countries. Following the standards and procedures put in place by Baker Tilly's international board, Hansen audited ShengdaTech's annual financial statements for the fiscal year ended December 31, 2007 (the "2007 Financial Statements") and reviewed ShengdaTech's quarterly financial statements for the first three quarters of 2008 (the "2008 Quarterly Financial Statements"). Hansen issued unqualified audit opinions on the 2007 Financial Statements, attesting that they presented ShengdaTech's financial performance and the results of its operations and cash flows in conformity with accounting principles generally accepted in the United States of America ("US GAAP").

11.    In November 2008, ShengdaTech fired Hansen and hired KPMG HK to replace it. KPMG HK is a member of KPMG International, a global network of accounting firms operating in 156 countries. KPMG HK audited the Company's annual financial statements for the fiscal years ended December 31, 2008 (the "2008 Financial Statements") and December 31, 2009 (the "2009 Financial Statements") and issued unqualified audit opinions, attesting that the 2008 and 2009 Financial Statements presented ShengdaTech's financial performance and the results of its operations and cash flows in conformity with US GAAP. KPMG HK also conducted reviews of ShengdaTech's quarterly financial statements for the first three quarters of 2009 (the "2009 Quarterly Financial Statements") and the first three quarters of 2010 (the "2010 Quarterly Financial Statements"). Because KPMG HK's audits and reviews required application of United States accounting and auditing rules pursuant to SEC regulations, KPMG USA – the United States member of the KPMG International network – reviewed and

supervised the work KPMG HK performed for ShengdaTech, and approved the issuance of its unqualified audit opinions on the 2008 and 2009 Financial Statements.

12.    Based on Hansen's and KPMG HK's audits, reviews and unqualified audit opinions – none of which suggested any significant problems – the Board believed the 2007, 2008 and 2009 Financial Statements and the 2008, 2009 and 2010 Quarterly Financial Statements (collectively, the "Financial Statements") to be correct.  The Board relied on the Financial Statements when overseeing the management of the Company, and caused ShengdaTech to publish the Financial Statements in numerous SEC filings and securities offering documents.

13.    What the Board and investors did not know – and what Defendants failed to discover during their audits and reviews – is that the Company's true financial condition was far different from what its Financial Statements reflected. Cash that was reported to exist in bank accounts had been siphoned off by the Company's Chief Executive Officer, Xiangzhi Chen ("Chen"), and his cohorts for non-corporate purposes, while sales reports included numerous transactions that were entirely fictitious.

14.    Because of Defendants' failure to detect this misconduct while auditing and reviewing the Company's Financial Statements, the Board did not learn of these problems until early 2011 – and might never have learned of these problems had a member of its Audit Committee not insisted that KPMG HK expand its audit procedures.  In or around May 2010, a member of ShengdaTech's Audit Committee met with KPMG HK's lead audit partner in connection with a quarterly review.  During this meeting, KPMG HK offhandedly mentioned that, during its audit of ShengdaTech's financial statements for the year ended December 31, 2009 (the "2009 Financial Statements"), it had received a higher number of confirmation replies than it typically saw during an audit.  While KPMG HK claimed that this was nothing to cause concern, the Audit Committee

member nonetheless insisted that KPMG HK conduct a deeper dive into this issue when auditing the Company's financial statements for the year ended December 31, 2010 (the "2010 Financial Statements"). After KPMG HK did as it was told and performed additional procedures, it quickly uncovered major problems.

15.   On or about March 2, 2011, KPMG HK informed the Board's Audit Committee (comprised of three non-management directors) that KPMG HK had uncovered "potentially serious discrepancies and unexplained issues relating to the [Company's] financial records" during the course of its audit of the Company's 2010 Financial Statements. In response to this shocking development, ShengdaTech's Board promptly formed a committee (the "Special Committee" or "Committee") to investigate these issues, and appointed the members of the Company's Audit Committee to serve on the Special Committee. The Board caused the Company to file a Form 8-K publicly disclosing the identification of "potential serious discrepancies and unexplained issues" in the Company's financial records, as well as the Company's appointment of a Special Committee, on March 15, 2011.

16.   In light of the wrongdoing it belatedly uncovered after conducting the deeper investigation requested by the Audit Committee, KPMG HK had no choice but to withdraw its unqualified audit opinions on the 2008 and 2009 Financial Statements. KPMG informed the Company that "disclosures should be made and action should be taken to prevent future reliance on [KPMG's] previously issued audit reports related to the consolidated balance sheets of [ShengdaTech] and its subsidiaries as of December 31, 2008 and 2009, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009." Accordingly, ShengdaTech disclosed in a May 5, 2011 SEC filing that KPMG was disclaiming its unqualified audit opinions on the Company's 2008 and 2009 Financial

1 Statements and its representations that the Company had adequate internal
2 controls over financial reporting during the fiscal year ended December 31, 2009.

3     17.   Hansen and KPMG HK, who were responsible for closely
4 scrutinizing the Company's financial records in search of signs of fraud or
5 misstatements, were, at a minimum, negligent in failing to uncover management's
6 misconduct, and breached their contracts with ShengdaTech by failing to perform
7 their audit services in conformity with the auditing standards they had agreed to
8 follow.   Baker Tilly, KPMG International, and KPMG USA are liable for
9 Hansen's and KPMG HK's negligence under principles of *respondeat superior*.

10     18.   When the truth emerged, ShengdaTech spiraled into bankruptcy and
11 was forced to spend substantial amounts of money investigating the cause of the
12 Company's swift demise and defending against lawsuits and investigations
13 relating to its collapse.  Defendants' negligence and breach of contract have
14 caused ShengdaTech substantial harm.

15 **III.  PARTIES**

16     **A.   Plaintiff**

17     19.   The ShengdaTech Liquidating Trust (the "Liquidating Trust") was
18 created pursuant to ShengdaTech's Plan of Reorganization, as approved by this
19 Court by order dated October 2, 2012, and pursuant to a Liquidating Trust
20 Agreement (the "Liquidating Trust Agreement") that was provided for in the Plan
21 of Reorganization and was executed on October 17, 2012, by and between
22 ShengdaTech and Michael Kang in his capacity as ShengdaTech's liquidating
23 trustee ("Trustee").

24     20.   Pursuant to the Plan of Reorganization and the Liquidating Trust
25 Agreement, all assets of ShengdaTech, including all claims and causes of action
26 held by ShengdaTech, were transferred to the Liquidating Trust, and the
27 Liquidating Trust is empowered to take such actions as are necessary to pursue,
28 prosecute, resolve or compromise, all such causes of action.

**B.    Defendants**

21.    Defendant Hansen, Barnett & Maxwell, P.C. ("Hansen") provides auditing, assurance, tax, client accounting, and consulting services for a wide range of clients.  Hansen is headquartered in Salt Lake City, Utah, and is a member of Baker Tilly.   Hansen audited ShengdaTech's 2007 Financial Statements and reviewed its 2008 Quarterly Financial Statements, with assistance from other Baker Tilly member firms, including Baker Tilly Shanghai.

22.    Defendant Baker Tilly International Limited ("Baker Tilly") is a network of accountancy and business advisory firms incorporated in England and Wales.  Baker Tilly coordinates a global network of professional Baker Tilly-affiliated firms that provide accounting and business advisory services through 156 member firms in 131 countries.  Baker Tilly member and network firms "share[] values" that define "what [Baker Tilly] stand[s] for and how [Baker Tilly] do[es] things, forming the basis for a consistent approach to service delivery worldwide."[2]  Baker Tilly's board "has ultimate responsibility for upholding the values, standards and procedures of Baker Tilly International, and sets the network's strategy and priorities.  Board members are senior partners drawn from member firms across the network and are elected by members worldwide for a three-year term."[3]

23.    Upon information and belief, Baker Tilly dominated and controlled Hansen in connection with its audits of ShengdaTech.  Information regarding the exact relationship between Baker Tilly and Hansen is within the exclusive control of these Defendants, and discovery will therefore demonstrate the full extent to which these entities act for and answer for each other.

24.    Defendant KPMG International Cooperative ("KPMG International") is a Swiss entity that coordinates a global network of professional KPMG-

[2] http://www.bakertillyinternational.com/web/about-us.aspx.

[3] http://www.bakertillyinternational.com/web/about-us/governance.aspx.

affiliated firms that provide audit, tax, and advisory services to clients in 150 countries, with 138,000 people working in member firms around the world. KPMG International and its member and network firms market themselves worldwide under the brand name "KPMG." All KPMG member firms commit to abide by a common set of KPMG values that are established by the Global Board, which is KPMG International's principal oversight and governance body. The Global Board Council, which includes representatives of 54 member firms, focuses on high-level governance tasks and facilitates discussion with and between member firms.

25.    Defendant KPMG LLP ("KPMG USA") is a United States-based audit, tax, and advisory services firm, which operates from 87 offices with more than 23,000 employees and partners throughout the United States. KPMG USA is the United States member firm of the KPMG network of firms affiliated with KPMG International. KPMG USA supervised and reviewed the audit and review work that KPMG HK (defined below) performed for ShengdaTech, and approved KPMG HK's issuance of unqualified audit reports on the 2008 and 2009 Financial Statements. KPMG International provided KPMG HK with auditing resources and facilitated communication between KPMG HK and KPMG USA concerning the Company's audits and reviews.

## IV.    RELEVANT NON-PARTIES

26.    ShengdaTech was a Nevada corporation with its principal place of business in China. ShengdaTech manufactured a specialty additive known as nano-precipitated calcium carbonate ("NPCC") through its subsidiary companies based in the People's Republic of China. NPCC is used in a variety of products to enhance their durability and efficiency and is widely applied in the paint, paper, plastic, and rubber industries and is used for building materials such as PVC. ShengdaTech conducted its manufacturing operations through five affiliated companies located in the People's Republic of China:    Shandong Haize

Nanomaterials Co., Ltd. ("Shandong Haize"), Shandong Bangsheng Chemical Co., Ltd. ("Shandong Bangsheng"), Shaanxi Haize Nanomaterials Co., Ltd. ("Shaanxi Haize"), Zibo Jiaze Nanomaterials Co., Ltd. ("Zibo Jiaze"), and Anhui Yuanzhong Nanomaterials Co., Ltd. ("Anhui Yuanzhong") (collectively, the "PRC Subsidiaries"). The PRC Subsidiaries are owned by Faith Bloom Limited ("Faith Bloom"), a wholly-owned subsidiary of ShengdaTech that is organized under the laws of the British Virgin Islands.

27.   KPMG, a Hong Kong Partnership ("KPMG HK"), is a member firm of the KPMG network of member firms affiliated with Defendant KPMG International. KPMG HK is the entity that signed KPMG's audit reports on the Company's 2008 and 2009 Financial Statements. KPMG HK conducted its audits and reviews under the direct supervision of KPMG USA.

28.   Xiangzhi Chen ("Chen") was ShengdaTech's President and Chief Executive Officer and the Chairman of its Board of Directors from March 31, 2006 until August 19, 2011. Chen was also the Company's largest shareholder, owning over 42.25% of ShengdaTech's outstanding shares. Chen was ousted from his positions at ShengdaTech on August 19, 2011, after he took deliberate steps to thwart the Special Committee's internal investigation into financial improprieties at the Company. Upon information and belief, Chen's efforts to obstruct the investigation were intended to hide the fact that he had, for years, been looting the Company by improperly diverting corporate funds to himself and other non-corporate uses.

V.   **FACTUAL ALLEGATIONS**

    A.   **Historical Background Of ShengdaTech And Its Retention Of Hansen And KPMG HK**

29.   The company now known as ShengdaTech was formed in March 2006 by a "reverse merger" between a United States shell company, Zeolite Exploration Company ("Zeolite"), and a British Virgin Islands company called

Faith Bloom. To effectuate the reverse merger, Zeolite acquired all of the issued and outstanding capital stock of Faith Bloom in exchange for 50,957,603 shares of Zeolite common stock. Zeolite changed its name to ShengdaTech, Inc. on January 3, 2007, and ShengdaTech's stock began trading on the NASDAQ in May 2007.

30.    During its tenure as a publicly-traded company, ShengdaTech had two outside auditors – Hansen and KPMG HK. Hansen served as ShengdaTech's outside auditor from December 2006 until November 2008. In this capacity, Hansen audited ShengdaTech's 2007 Financial Statements and its internal controls over financial reporting for the year ended December 31, 2007, and reviewed its 2008 Quarterly Financial Statements.

31.    Baker Tilly facilitated Hansen's engagement for the ShengdaTech audit, and Baker Tilly's company logo was prominently displayed on the October 19, 2007 engagement letter for Hansen's audit of the 2007 Financial Statements and its review of the 2008 Quarterly Financial Statements (the "Engagement Letter"). Hansen's affiliation with a large, prestigious organization like Baker Tilly positioned the small Utah-based firm to secure its engagement to audit the China-based ShengdaTech. In hiring Hansen, ShengdaTech understood that Hansen's work would be performed pursuant to network-wide standards and regulations created by Baker Tilly, and that Hansen auditors would be able to draw upon the substantial resources and expertise of Baker Tilly accountants around the globe. As a member firm of Baker Tilly, Hansen was required at all times during its audits and reviews of ShengdaTech to comply with the values, standards, and procedures imposed by Baker Tilly's international board.

32.    KPMG HK served as ShengdaTech's outside auditor from November 2008 until its resignation on April 19, 2011. In its capacity as ShengdaTech's outside auditor, KPMG HK audited the Company's 2008 and 2009 Financial Statements and internal controls, and reviewed the 2009 and 2010 Quarterly Financial Statements.

33.    Because KPMG HK contracted to provide services in accordance with US GAAP, KPMG USA – the KPMG International firm based in the United States – reviewed and oversaw KPMG HK's audits of ShengdaTech to ensure that they were performed properly.    Thus, KPMG HK's audits and reviews were performed under the direction and control of KPMG USA.

34.    As a member firm of KPMG International, KPMG HK was required at all times to conduct its audits of ShengdaTech in accordance with policies and regulations created by KPMG International's Global Board.  In hiring KPMG HK, ShengdaTech understood that KPMG HK would be able to draw upon the resources of KPMG International member firms in conducting its audits.

**B.    Hansen And KPMG HK Issued Unqualified Audit Opinions, Leading The Board To Publish The Financial Statements**

35.    Hansen issued an unqualified audit opinion on the Company's 2007 Financial Statements, stating that they fairly presented the Company's financial condition and the results of its operations in accordance with US GAAP and that the Company maintained effective internal controls over financial reporting.  The 2007 Financial Statements reported, *inter alia*, cash and cash equivalents of $26,366,568; total assets of $100,943,938; sale of products of $100,654,793; and net income of $27,030,345.

36.    In reliance on Hansen's unqualified audit opinion, the Board caused the 2007 Financial Statements to be released to the public and included in, among other things:  (1) the Company's amended annual report on Form 10-K/A for the year ended December 31, 2007, filed with the SEC on May 15, 2008 (the "2007 10-K/A");  (2) the Company's annual report on Form 10-K for the fiscal year ended December 31, 2008, filed with the SEC on April 1, 2009 (the "2008 10-K"); (3) the Company's annual report on Form 10-K for the year ended December 31, 2009, filed with the SEC on March 15, 2010 (the "2009 10-K"), and an amendment thereto filed on September 15, 2010 (the "2009 10-K/A); (4) the

offering memorandum for a 2008 offering of $115,000,000 of 6.0% Convertible Senior Notes due 2018 (the "6.0% Notes Offering Memorandum"); and (5) the offering memorandum for a December 2010 offering of $130,000,000 of 6.5% Senior Convertible Notes Due 2015 (the "6.5% Notes Offering Memorandum"). Hansen was aware of the Company's inclusion of the 2007 Financial Statements in these documents, and consented thereto.

37.    Hansen also reviewed the Company's 2008 Quarterly Financial Statements, and when it did not raise any concerns about those financial statements, the Board caused them to be included in Form 10-Q and 10-Q/A filings dated May 6, 2008, May 14, 2008, August 18, 2008 and November 10, 2008 (the "2008 Form 10-Qs"). Financial information from the first quarter 2008 financial statements was also included in the 6.0% Notes Offering Memorandum.

38.    KPMG HK issued unqualified audit opinions on the 2008 Financial Statements and the 2009 Financial Statements, stating, *inter alia*, that they fairly presented the Company's financial condition and the results of its operations in accordance with US GAAP. KPMG HK also stated that, in its opinion, the Company maintained effective internal controls over financial reporting in 2009. The 2008 Financial Statements reported, *inter alia*, cash of $114,287,073, total assets of $243,908,940, net sales of $149,427,139, and net income of $40,035,451. The 2009 Financial Statements reported, *inter alia*, cash of $115,978,763, total assets of $271,054,359, net sales of $102,121,804, and net income of $23,104,607.

39.    In reliance upon KPMG HK's unqualified audit opinions, the Board caused ShengdaTech to release the 2008 and 2009 Financial Statements to the public. The 2008 Financial Statements were included in the 2008 10-K, while both the 2008 and 2009 Financial Statements were included in the 2009 10-K, 2009 10-K/A, and the 6.5% Notes Offering Memorandum. KPMG HK was aware of the Company's inclusion of the 2008 and 2009 Financial Statements in these documents, and consented thereto.

40.    KPMG HK, under the supervision and direction of KPMG USA, also reviewed ShengdaTech's 2009 and 2010 Quarterly Financial Statements.  When KPMG HK raised no serious concerns with respect to those financial statements, the Board caused the Company to publish the  2009 Quarterly Financial Statements in Form 10Q filings dated May 11, 2009, August 10, 2009 and November 9, 2009 (collectively, the "2009 10-Qs") and caused the Company to publish the 2010 Quarterly Financial Statements in Form 10-Q and 10-Q/A filings with the SEC dated May 10, 2010, July 29, 2010, August 9, 2010, September 15, 2010, and November 8, 2010 (collectively, the "2010 10-Qs").    Financial information from the 2010 Quarterly Financial Statements was also included in the 6.5% Notes Offering Memorandum.

**C.    The Board Learns That ShengdaTech's Financial Condition And Results During 2007-2010 Were Not As Represented In The Financial Statements**

41.    Unbeknownst to ShengdaTech's Board and shareholders, the Financial Statements were far from accurate.  While Hansen and KPMG HK were supposed to be auditing ShengdaTech's financial statements and reviewing its internal controls to guard against fraud, Chen and his cohorts in ShengdaTech management has been looting the Company, stealing money for their own gain and then creating false documents to cover their tracks.  Despite their duty to obtain reasonable assurance that ShengdaTech's financial statements were free of material misstatements and omissions, Defendants failed to detect this blatant and rudimentary fraud for years.  As a result, the non-management members of the Board did not learn of management's defalcations until 2011, after substantial damage had already been done.

42.    In or around May 2010, a member of ShengdaTech's Audit Committee met with KPMG HK's lead engagement partner to discuss a quarterly review KPMG HK was conducting.  During this meeting, the audit partner casually mentioned that during KPMG HK's audit of ShengdaTech's 2009

Financial Statements, it had received a higher number of confirmation replies than it typically received.   While the audit partner tried to assure the Special Committee member that this was nothing to cause concern, the Audit Committee member nonetheless insisted that KPMG HK conduct a deeper review of this issue during its audit of the 2010 Financial Statements and asked KPMG HK to perform additional procedures to verify the accuracy of ShengdaTech's reported transactions.

43.   As a result of performing these additional procedures requested by ShengdaTech's Audit Committee, KPMG HK quickly uncovered problems.   On March 2, 2011, KPMG HK contacted the Chairman of ShengdaTech's Audit Committee, advising him of the discovery of "potentially serious discrepancies and unexplained issues" that were discovered after KPMG performed the requested additional procedures during its audit of the 2010 Financial Statements. KPMG HK then provided a draft letter dated March 3, 2011 that described these discrepancies and issues, most of which related to KPMG HK's efforts to confirm sales the Company had recorded on its books following the Audit Committee's request that it perform additional procedures.   For example:

a.   Many of the PRC Subsidiaries' customers in China pay for their purchases of goods and services by submitting "bills" to the PRC Subsidiaries.   Despite KPMG HK having asked the PRC Subsidiaries to retain copies of all bills, the PRC Subsidiaries provided KPMG HK with copies of only 6 bills.   Of these 6 bills, 5 were issued by entities (the "bill issuers") other than the Company's customers, yet the PRC Subsidiaries had listed the customers' names on the bank deposit slips, instead of the bill issuers' names. When KPMG HK performed background checks on the bill issuers, it determined that 3 of them had no offices at their registered business addresses (including one whose business address was the home address of an executive at one of the PRC Subsidiaries, and was also the

16

registered business address of another entity controlled by Chen). The registered business address of a fourth bill issuer was a hotel room in a hotel that KPMG HK was unable to locate.

b.      KPMG HK tried to perform a site visit to Beijing Xiling, to which the Company had recorded RMB[4] 15.5 million of sales in 2010, making it the Company's second largest customer. KPMG HK found that the company had no offices at the address typed on the sales invoices issued to it. The gatekeeper at that building advised KPMG HK that Beijing Xiling had moved out of the building 5-6 years earlier. The Company provided a different Beijing Xiling address to KPMG HK for sales confirmation purposes, but KPMG found that this address was registered to an entity other than Beijing Xiling.

c.      KPMG HK selected a number of ShengdaTech customers for confirmation of sales amounts, terms, and outstanding balances. As shown in the chart below, for certain customers the information received in response to written requests sent to the customer addresses provided by ShengdaTech management was consistent with ShengdaTech's own records, but the information KPMG HK obtained after contacting those customers directly was materially different and showed a substantially smaller amount of sales (or no sales):

---

[4] "RMB" refers to Renminbi, the currency of the People's Republic of China. At current exchange rates, RMB 100 is approximately equivalent to US $16.24.

17

| Customer | 2010 Sales Recorded in ShengdaTech's Books (RMB) | 2010 Sales Confirmed Via Inquiry Sent to Address Provided by ShengdaTech Management (RMB) | 2010 Sales Confirmed Via Direct Customer Contact (RMB) |
|---|---|---|---|
| Xika (China) | 7,667,094 | 7,667,094 | 0 |
| Zhengzhou Minghua | 7,621,367 | 7,621,367 | 114,000 |
| Zhengzhou Zhongyuan | 9,525,897 | 9,525,897 | 662,000 |

   d. KPMG HK mailed customer sales and accounts receivable confirmations to customers of ShengdaTech's Shaanxi Haize subsidiary and also to customers of ShengdaTech's subsidiaries in Shangdong province. These confirmations were separately mailed from Shangdong and Shaanxi by different audit teams, and the two sets of confirmations were accompanied by return envelopes bearing different addresses – one for the Shangdong subsidiaries' customers and one for the Shaanxi Haize customers. However, the confirmations returned by 5 of the Shangdong subsidiaries' customers were returned in the envelopes for the Shaanxi Haize customers.

   44. The Board convened a telephonic special meeting on March 4, 2011, during which it discussed the issues KPMG HK had identified as a result of performing the additional procedures requested by the Audit Committee and established a Special Committee – comprised of the three members of the Audit Committee – to conduct an internal investigation. On March 7, 2011, the Special Committee retained the law firm of O'Melveny & Myers, LLP ("O'Melveny") to assist in the investigation, and soon thereafter O'Melveny retained PricewaterhouseCoopers LLP ("PWC") to assist. O'Melveny was later replaced

by Skadden Arps Slate Meagher & Flom LLP ("Skadden") as the Committee's counsel in May 2011.

45.    On March 9, 2011, KPMG HK informed the Audit Committee in writing that it had "become aware of information indicating that an illegal act has or may have occurred" in relation to the matters communicated by KPMG HK the previous week.

46.    On March 14, 2011, KPMG HK informed the Audit Committee by telephone of additional matters that KPMG had discovered, involving irregularities in customer confirmations and bank confirmations.  In particular:

a.    KPMG HK had received another communication directly from one of the customers whose purchases KPMG had sought to confirm.  That customer, Jiangsu Libao, stated that it had purchased nothing from the Company in 2010.  By contrast, the Company's books, as well as the written confirmation KPMG HK had received in response to an inquiry sent to the address provided by Company management, indicated that the Company sold RMB 7,850,769 in goods to this customer during 2010.

b.    KPMG HK had received information from the Bank of China, Tai'an Branch, indicating that the Company's account balances as of December 31, 2010 were RMB 89,949.48 and USD 67.61 – only a small fraction of the RMB 13,282,581.99 and USD 50,054.18 balances shown on the Company's books as of December 31, 2010.

47.    On March 15, 2011, the Board caused ShengdaTech to issue a press release and file a Form 8-K with the SEC, informing the public of KPMG's discovery of "potentially serious discrepancies and unexplained issues relating to the Company's and its subsidiaries' financial records," and of the appointment of the Special Committee to investigate.  Two days later, ShengdaTech disclosed that the SEC had been informed of the internal investigation, and that the Company

1  would be unable to timely file its Form 10-K for the year ended December 31,
2  2010.

3      48.    On March 17, 2011, KPMG HK informed the Audit Committee that
4  it had uncovered the following additional irregularities:

5          a.    When KPMG HK tried to confirm the Company's accounts
6      payable balances with two of its top ten suppliers for 2010, Xianyang
7      Chuangfa and Xingtai Guangfa, ShengdaTech management informed
8      KPMG HK that the suppliers would not agree to site visits.  KPMG HK
9      then independently contacted Xianyang Chuangfa and was told that
10      Xianyang Chuangfa had no balances with the Company and had not done
11      any business with the Company for a long time, other than sending some
12      samples to Shaanxi Haize in 2006 or 2007.  KPMG HK attempted to
13      contact Xingtai Guangfa but was unable to find a working phone number
14      for that entity.

15          b.    KPMG  HK  received  an  email,  purportedly  from  the
16      Agricultural Bank of China, Qianxian Branch, confirming the account
17      balance of RMB 553,062,048.83 as reported in the Company's books as of
18      December 31, 2010. However, when KPMG HK contacted the bank branch
19      by telephone, they were told that the branch had never received KPMG
20      HK's confirmation request, and that the Company's reported balance could
21      not be correct because the total of *all* business accounts maintained at this
22      branch was only about RMB 200 million.  The bank declined to provide
23      KPMG HK with the correct balance.  KPMG HK then decided to look
24      again at the confirmations received from this branch for the prior two years,
25      ended December 31, 2008 and December 31, 2009, and noticed that those
26      confirmations purported to bear the chop[5] of the Qianxian Branch, but the

27  ─────────────
28  [5] A "chop" is a stamp imprinted with a unique composition of Chinese characters,
    which is akin to a corporate seal and is used in lieu of a signature.  Only those
    persons who control a company's chop are able to withdraw money from its bank

1   chop on the 2008 confirmation differed from the chop on the 2009 and 2010
2   confirmations, suggesting that the 2009 and 2010 confirmations and chops
3   had been falsified.

4        c.    KPMG HK contacted China Merchants Bank (CMB) – Jinan
5   Branch to try to confirm the Company's recorded account balance of USD
6   73,118,638.32 as of December 31, 2010. KPMG HK was informed that this
7   was an offshore account, and therefore any confirmation and bank chop
8   would have to come from the Shenzhen Head Office – Offshore
9   Department.  The confirmation KPMG HK had received for the bank
10  balances as of the year-end 2008, 2009 and 2010, however, had each borne
11  the chop from the Jinan Branch, and had arrived in envelopes from the
12  Jinan Branch.

13       d.    KPMG HK selected 6 copies of value-added-tax ("VAT")[6]
14  invoices that had been received from the Company, and checked them
15  against the information posted by the National Taxation Bureau of
16  Shangdong ("NTBS").  On the 2 invoices relating to product sales by the
17  Company, the name of the seller/issuer on the VAT invoice copies did not
18  match the issuer's name on the NTBS online system.  On the 4 invoices
19  relating to purchases made by the Company, the name of the service
20  provider/issuer on the invoices did not match the issuer's name on the
21  online system.

22

23

24  accounts. Chen controlled all of the PRC Subsidiaries' chops. In addition, during
    the relevant time, persons under Chen's control were the only signatories to Faith
25  Bloom's bank accounts.

26  [6] VAT is the basis of the taxation system in the People's Republic of China and is
    the major source of fiscal revenue for the Chinese government.  In essence, those
27  who sell merchandise, provide processing, repairing, or assembling service, or
    import goods within the territory of the People's Republic of China are required to
28  pay tax on the added value derived from their sales or services.

e.    During the course of its audit of the 2009 Financial Statements, KPMG HK had been told that a person familiar with the market for ShengdaTech's products believed that the Company's reported sales figures exceeded what he understood to be the likely global market demand for those products.  KPMG HK had not made the Audit Committee aware of this during the course of its audit of the 2009 Financial Statements.

49.    In response to the discovery of discrepancies concerning the Company's bank account balances, the Special Committee sought to implement a Cash Control Plan, under which all of the Company's cash assets would be transferred into accounts over which the Audit Committee would have signature authority.  The Special Committee experienced trouble implementing the Cash Control Plan when the PRC Subsidiaries' banks indicated that this process would require the cooperation and authorization of ShengdaTech's management – namely, Chen.  Despite opposition from Chen, Special Committee Members Zhang and Mudd were eventually named signatories under the Cash Control Plan.  However, Chen transferred *only about $14 million* – a far cry from the $110-plus million in cash that ShengdaTech had consistently reported having in its 2008 10-K, 2009 10-K and 2010 10-Qs – from the PRC Subsidiaries' and Faith Bloom's accounts into the Cash Control Account.

50.    When questioned by the Special Committee about the location of the remaining funds, Chen claimed that certain of the Company's cash was tied up in certificates of deposit ("CDs") and that he was in the process of negotiating their liquidation.  The Special Committee was unable to verify the authenticity of these CDs.  While Chen provided the Special Committee with photocopies of what purported to be $65 million worth of CDs, he was unresponsive to requests for further information.  The Special Committee subsequently learned that the bank that purportedly issued the CDs was unable to verify them and, in fact, had no record of issuing them to the ShengdaTech subsidiary (Faith Bloom) that

reportedly held them.  The precise fate of the rest of Company's funds is still unknown, but it was not used for any purpose benefiting ShengdaTech or its public shareholders.

51.  On April 19, 2011, KPMG informed the Company that ShengdaTech's senior management had not taken timely and appropriate remedial action with respect to the discrepancies and issues that KPMG had identified in the course of its 2010 audit.

52.  On April 20, 2011, the NASDAQ Listing Qualifications Department informed the Company by letter that its shares would be delisted.  Among the reasons cited were "public interest concerns … raised by the serious accounting and operational issues uncovered by KPMG" and "the deliberate and ongoing efforts of the Company's Chief Executive Officer and Acting Chief Financial Officer, Mr. Xiang Zhi Chen and Ms. Anhui Guo, respectively, to obstruct an internal investigation into these matters."

53.  On April 29, 2011, KPMG HK informed the Audit Committee that it was resigning as the Company's independent accountant effective immediately. In a letter of the same date confirming its resignation, KPMG HK stated that "[t]he manner of management's conduct during the investigation by [the Special Committee] raises doubts about management's representations provided to [KPMG HK] in connection with [its] 2008 and 2009 audits of the consolidated financial statements and the effectiveness of internal control over financial reporting of the Company."  KPMG HK's April 29 letter also stated that "disclosures should be made and action should be taken to prevent future reliance on [KPMG HK's] previously issued audit reports related to the consolidated balance sheets of ShengdaTech, Inc. and its subsidiaries as of December 31, 2008 and 2009, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended and the

effectiveness of internal control over financial reporting as of December 31, 2008 and 2009."

54.    On May 5, 2011, the Board caused ShengdaTech to file a Form 8-K and issued a press release disclosing KPMG HK's resignation and warning investors against continued reliance upon KPMG HK's audit reports on the 2008 and 2009 Financial Statements.  The Form 8-K also noted that KPMG's concerns regarding ShengdaTech's financial statements "included serious discrepancies and unexplained issues relating to, among others: (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) VAT invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies between KPMG HK's direct calls to customers and confirmations returned by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivables."

55.    On June 8, 2011, the NASDAQ Listing Qualifications Panel affirmed its decision to delist ShengdaTech's common stock.  Trading in the stock was suspended on June 10, 2011.

56.    In June 2011, the Company defaulted on the notes that had been issued pursuant to the 6.0% Notes Offering Memorandum and the 6.5% Notes Offering Memorandum.

57.    On August 11, 2011, the SEC initiated a regulatory proceeding titled *In re ShengdaTech, Inc.* (LA-3397).  The formal Order entered by the SEC in connection with this proceeding (the "SEC Order") raised potential violations of the federal securities laws arising from, *inter alia*, false statements in the financial statements set forth in the 2009 Form 10-K, the 2009 Form 10-K/A, and the 2009 and 2010 Form 10-Qs.

58.    On August 19, 2011, ShengdaTech filed for bankruptcy protection in the United States Bankruptcy Court for the District of Nevada.  That same day, the

Special Committee announced that it had removed all members of ShengdaTech's management – including Chen – from their positions, effective immediately.

59. On August 22, 2011, the SEC enforcement staff served ShengdaTech with a subpoena pursuant to the SEC Order. The subpoena was broad and requested the production of a myriad of documents relating to the Company's finances, taxes, bank accounts, sales, financial statements, internal auditing, and professional services rendered in connection therewith, as well as the hiring, firing and compensation of the Company's officers and directors. The Company cooperated and exchanged information with the SEC enforcement staff.

60. On December 15, 2011, NASDAQ officially delisted ShengdaTech. The stock had not traded on NASDAQ since its June 10, 2011 suspension.

61. On February 15, 2012, the SEC filed a proof of claim in the Bankruptcy Proceeding. In this proof of claim, the SEC indicated that its investigation into the Company was continuing and that it may file a civil action against ShengdaTech based on possible violations of the federal securities laws.

**D.    The Results Of The Special Committee Investigation**

62. Through its investigation, the Special Committee determined that ShengdaTech's bank accounts contained substantially less money in 2007-2009 than was reported in the Financial Statements audited and reviewed by Defendants. For example, bank statements from the various banks in which ShengdaTech's subsidiaries (Faith Bloom and the PRC Subsidiaries) held accounts confirmed that these accounts contained less than $68.5 million as of December 31, 2008, and less than $35.9 million as of December 31, 2009 – far short of the $114.3 million and $116 million that was reported in the 2008 Financial Statements and the 2009 Financial Statements, respectively.

63. The discrepancies between the Company's reported and actual cash balances are a result of Chen and certain other members of ShengdaTech management looting the Company by covertly debiting (or causing to be debited)

millions of dollars from ShengdaTech's subsidiaries' bank accounts for their own pecuniary gain.[7] For example:

> a.    The $114.3 million in cash that was reported on Shengdatech's balance sheet in the 2008 Financial Statements included approximately $56.3 million that was reportedly held in the PRC Subsidiaries' bank accounts as of December 31, 2008. The actual bank balances for the PRC Subsidiaries were only approximately $10.5 million as of December 31, 2008, and over $67 million was debited from the PRC Subsidiaries' bank accounts from May 2008 through December 2008.

> b.    The $116 million in cash that was reported on ShengdaTech's balance sheet in the 2009 Financial Statements included approximately $82.9 million that was reportedly held in the PRC Subsidiaries' bank accounts. The PRC Subsidiaries' actual bank account balances at the end of 2009 were only approximately $2.8 million, and at least $162 million was debited from these accounts during 2009.

> c.    The Company's 2010 Quarterly Financial Statements -- which KPMG HK reviewed -- consistently reported cash balances in excess of $110 million ($117 million as of March 31, 2010, $110.6 million as of June 30, 2010, and $120.65 million as of September 30, 2010). The 2010 Financial Statements -- which KPMG HK was in the midst of auditing when it resigned -- reported cash holdings of $105.9 million in the PRC Subsidiaries' bank accounts and $73 million in Faith Bloom's bank accounts as of December 31, 2010. The PRC Subsidiaries' actual bank balances as of that date were only approximately $1.4 million and the Faith Bloom accounts contained only about $50,000. At least $117 million had

---

[7] As noted in footnote 5, *supra*, only persons who controlled the PRC Subsidiaries' chops had the ability to move money from the PRC Subsidiaries' bank accounts. Chen controlled the PRC Subsidiaries' chops and Faith Bloom's bank accounts.

been debited from the PRC Subsidiaries' bank accounts during 2010, including \$42 million in the second quarter alone.

64.    The Special Committee also uncovered that ShengdaTech had materially overstated its sales figures by, among other things, reporting fictitious transactions.    When the Special Committee's advisors contacted certain of the PRC Subsidiaries' customers as part of their internal investigation – a step the Defendants should have taken during the course of their audits – they discovered that the 2008 and 2009 Financial Statements reflected transactions that had never actually taken place. For example:

a.    Six customers stated that they had never purchased anything from Shaanxi Haize (and three of them had never even heard of that entity), yet the Company's sales figures included over RMB 190,000,000 in purported sales by Shaanxi Haize to these customers during the period from 2006 to 2009.

b.    One customer informed PWC that it had made only one purchase from Shaanxi Haize in 2009, in the amount of RMB 15,000. However, the Company had invoices reflecting sales totaling RMB 3,581,050 to this customer.

c.    Another customer was shown three invoices purportedly sent to it by Shaanxi Haize, but it informed PWC that it had never received any of those invoices.

d.    Another customer stated that it never received an invoice in excess of RMB 100,000 from Shaanxi Haize, and that the total invoices it received each year from that entity were around RMB 700,000 or 800,000. ShengdaTech's records, however, showed invoices totaling RMB 6,016,400 from Shaanxi Haize to this customer in 2009 alone, and each of those invoices was in excess of RMB 100,000.

e.    Another customer stated that it had been purchasing from Shaanxi Haize since 2007 at an average rate of RMB 500,000 or 600,000 per year.  The Company's reported sales for 2006-2009 included sales of RMB 33,369,600 from Shaanxi Haize to this customer (*i.e.*, an average rate of RMB 8,342,400 per year).

**E.    Defendants Failed To Comply With Applicable Professional Auditing Standards And Thus Acted Negligently And In Violation Of Their Contractual Obligations To ShengdaTech**

65.    As described above, under Defendants' watch as ShengdaTech's auditors, tens of millions of dollars simply disappeared from the Company because it was diverted away by Chen and other managers for their own benefit. Hansen and KPMG HK were paid handsomely to examine the Company's Financial Statements to ensure that they were free from material misstatement. Steps as simple as verifying bank balances and customer transactions, and confirming the authenticity of CDs, would have revealed that ShengdaTech's Financial Statements were riddled with material misstatements, thus allowing the Board to minimize these defalcations at an early stage.  However, Hansen and KPMG HK simply failed to do what they were hired to do.

66.    The federal securities laws require public companies to have annual audits conducted by outside audit firms.  The reason for this requirement is to provide an independent "check" on the conduct of company management, and to provide investors with a level of comfort that a company's financial condition and results are not being misrepresented by management.  In order to provide that comfort, audits are required to be conducted in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").

67.    In accordance with the federal securities laws, ShengdaTech's Board of Directors hired Hansen to audit the Company's internal controls over financial reporting for 2007, to audit the 2007 Financial Statements, and to review the 2008 Quarterly Financial Statements.  The Board later hired KPMG HK to audit the

Company's internal controls over financial reporting for 2008 and 2009, to audit the 2008 and 2009 Financial Statements, and to review the 2009 and 2010 Quarterly Financial Statements.   The engagement letters for these services required Hansen and KPMG HK to conduct their audits and reviews in accordance with the standards of the PCAOB.

68.   The PCAOB standards required Hansen and KPMG HK to perform their audit and review services according to auditing standards generally accepted in the United States ("US GAAS"), which included Statements on Auditing Standards ("SAS") issued by the American Institute of Certified Public Accountants ("AICPA"), and to issue unqualified opinions only if the Company's financial statements were fairly presented in accordance with US GAAP.

69.   US GAAS requires that an auditor exercise due professional care in performing an audit, in preparing the audit report, and in conducting quarterly reviews.

70.   Hansen and KPMG HK (as supervised by KPMG USA) failed to exercise due professional care, thus violating US GAAS, in auditing ShengdaTech's internal controls and in auditing and reviewing the Financial Statements.  The following are just a few examples of the steps these Defendants negligently failed to take in the course of their audits and reviews – and that KPMG HK belatedly took only because the Audit Committee asked it to conduct a deeper investigation into the unusually high number of confirmations KPMG HK received during its audit of the 2010 Financial Statements.  But for the Audit Committee's insistence that additional procedures be performed, the looting described herein may never have been uncovered.

(a)   **Defendants Failed To Verify ShengdaTech's Bank Account Balances**

71.   As described in greater detail above, when KPMG and the Special Committee's advisors contacted the PRC Subsidiaries' banks in 2011 and 2012 to

try to confirm the cash balances held at those banks, they quickly learned that ShengdaTech's financial statements materially overstated the Company's cash position. This was discovered through a simple comparison of the Company's financial statements with the bank balances obtained from the banks. Had Defendants taken this simple step, they would have discovered these discrepancies much earlier than they did, and the Board could have prevented further defalcations.

72. Had Defendants acted with appropriate diligence, they would have discovered that ShengdaTech's reported cash balances were vastly overstated, and would have informed the Audit Committee. The Audit Committee, in turn would have taken steps – as it did when it eventually learned of the problems in 2011 – to investigate these discrepancies, stop the looting of the Company, remove the wrongdoers from management, and ensure that accurate information was presented to shareholders and potential investors.

### (b)    Defendants Failed To Discover That The Company's Reported Sales Were Shams

73. Many of ShengdaTech's reported sales transactions were fictitious – a fact that would have been readily apparent had Defendants attempted to confirm their validity. When KPMG attempted to confirm certain of the Company's sales in 2011 during its audit of the Company's 2010 Financial Statements, the supporting paperwork that it received raised serious questions. Nonetheless, KPMG HK remained content to continue "business as usual" until the Audit Committee insisted that it conduct a deeper investigation. Only as a result of this investigation did the truth emerge.

74. As described in detail above, for many of the sales by ShengdaTech subsidiaries, the documentation provided to KPMG in 2011 consisted of "bills" ostensibly issued by the Company's customers to settle the charges. However, in many instances, those bills were not actually issued by the customers, but rather

were issued by other entities whose existence KPMG had difficulty confirming. Similarly, in 2011, KPMG visited ShengdaTech's second largest customer – Beijing Xiling – only to discover that Beijing Xiling did not have an office at the address where ShengdaTech addressed its bills and, in fact, had moved out of that address 5-6 years prior to their site visit.

75.     In addition, the Special Committee readily discovered via simple confirmatory phone calls that ShengdaTech was fabricating sales.  As described previously, at least ten customers informed the Special Committee's advisors that they had made either **no** purchases from the PRC Subsidiaries, or substantially fewer purchases than the Company claimed.  Had Defendants made similar inquiries, they would have discovered that the Company's sales were largely fictitious, and the Board would have taken action to remove Chen and protect the Company's assets.

### (c)     Defendants Failed To Discover That The Company Had Falsified Purchase Transactions

76.     ShengdaTech also reported fictitious purchases of supplies.  The Company reported that it had purchased RMB 67,635,785, RMB 59,049,409, and RMB 65,946,106 worth of coal in the years 2010, 2009 and 2008, respectively, from Xianyang Chuangfa.  When KPMG called to verify these amounts in 2011, it learned that this company had not done any business with ShengdaTech in years and that the company had no record of any of these alleged transactions.  In fact, the only business dealings that the company's representative could recall with ShengdaTech was that Xianyang Chuangfa had sent some samples to ShengdaTech's Shaanxi Haize division in 2006 or 2007.

77.     KPMG also could not verify whether another alleged supplier – Xingtai Guanfa, which allegedly sold ShengdaTech RMB 28,499,786 worth of coal in 2010 and RMB 9,785,328 worth of coal in 2009 – even existed.

78.     Defendants could and should have made similar inquiries during their audits of the 2007-2009 Financial Statements, and had they done so they would have discovered earlier that those financial statements were false, thus preventing the Company from publishing false information and allowing the Board to prevent the payment of false invoices.

(d)     **Hansen Negligently Failed To Adjust Its Audit Procedures To Address The Fact That ShengdaTech Did Not Have An Internal Audit Function**

79.     During 2007 and most of 2008, ShengdaTech did not have its own internal audit function.  In December 2007, ShengdaTech resolved to outsource its internal audit function to ShengdaGroup (a company that was related to ShengdaTech by virtue of Chen's ownership and control), for one quarter only, through March 2008.  As of June 25, 2008, the Company had still not hired an internal auditor.

80.     In August 2008, the Board authorized the retention of Ernst & Young ("E&Y") to perform the internal audit function.  This retention was finalized sometime prior to November 2008.

81.     Hansen and KPMG HK were negligent in failing to adjust their audit and review procedures to take into account the fact that ShengdaTech did not have an internal audit function during 2007 or much of 2008.  Because an internal audit function is an important safeguard against misstatements of financial results, Hansen and KPMG HK should have been particularly vigilant in investigating the accuracy of management's representations and the Company's reported financial results during the period when no such function existed.

(e)     **Hansen And KPMG HK Failed To Adjust Their Procedures As Necessary In Light Of Material Weaknesses In The Company's Internal Controls Over Financial Reporting**

82.    In November 2008, shortly after the Company retained E&Y to perform the Company's internal audit function, ShengdaTech fired Hansen and hired KPMG HK to serve as the Company's outside auditor.  From the outset of its engagement, KPMG HK was alerted to problems with the Company's financial reporting.  Within a few months after it was retained, KPMG HK reported that it had found material weaknesses in the Company's internal controls.  KPMG HK's March 31, 2009 report on its audit of ShengdaTech's internal controls for the year 2008 stated, *inter alia*:

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a *reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected* on a timely basis.  *Material weaknesses have been identified and included in management's assessment related to the lack of adequate policies, procedures and personnel to address the accounting for and disclosures of non-routine transactions and the Company's internal control over the accounting for income taxes.*

> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended.  These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2008 consolidated financial statements, and this report does not affect our report dated March 31, 2009, which expressed an unqualified opinion on those consolidated financial statements.

> *In our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, ShengdaTech, Inc. and subsidiaries have not maintained effective internal control over financial reporting as of December 31, 2008*, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

(emphasis added).

83.    The fact that "material weaknesses" existed and were uncovered by a new auditor within a few months of its retention, coupled with the fact that ShengdaTech was later revealed to have misstated such basic information as the Company's cash balances and its sales and payments to third parties, strongly suggests that such weaknesses also existed during Hansen's audit of ShengdaTech's 2007 Financial Statements and its review of the 2008 Quarterly Financial Statements, and that Hansen was negligent in issuing the unqualified audit opinion on which ShengdaTech's Board relied in reporting the 2007 Financial Statements to the public.

84.    Additionally, these known internal control deficiencies should have caused KPMG to be on heightened alert to the possibility that the Company's financial statements going forward might be misstated and to adjust its audit procedures accordingly.    GAAS Standard of Fieldwork No. 2 and AU § 319 instruct auditors to obtain a sufficient understanding of a company and its internal control structure to plan an effective audit that will allow the auditor to assess the audit risk associated with inadequate internal controls.    "Audit risk is the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on financial statements that are materially misstated."    AU § 312. 02, Audit Risk and Materiality in Conducting an Audit.    "Internal control" is defined as a process "designed to provide reasonable assurance regarding the achievement of objectives in the following categories:    (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations."    AU § 319.06, Consideration of Internal Control in a Financial Statement Audit – Definition of Internal Control.    For financial statement audits, internal controls serve as an integral way "to prevent or detect material misstatements in financial statement assertions."

85.     The presence of material weaknesses in ShengdaTech's internal financial controls – which KPMG HK admitted created a reasonable possibility that a material misstatement of the company's annual or interim financial statements would not be prevented or detected – should have caused KPMG HK to more closely question the Company's management to ensure that the Company's financial statements were accurate.    Instead, until it performed additional procedures at the behest of the Audit Committee during its audit of the 2010 Financial Statements, KPMG HK – with KPMG USA's blessing – simply accepted representations from management, and then reassured the Board and shareholders that the Company's financial statements were accurate by issuing a clean audit opinion on ShengdaTech's 2008 and 2009 Financial Statements and by failing to raise any serious concerns following its reviews of the 2009 and 2010 Quarterly Financial Statements.    Although KPMG HK's March 31, 2009 opinion stated that it had taken the known material weaknesses into consideration when determining what audit tests to apply, either KPMG HK failed to do so, or it did so negligently.

### F.    Hansen And KPMG HK Issued Unqualified Audit Opinions On Financial Statements That Did Not Comply With US GAAP

86.     As alleged herein, Hansen and KPMG HK issued unqualified audit opinions on the Company's 2007, 2008 and 2009 Financial Statements, stating that they "present[ed] fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries … and the results of their operations and cash flows … in conformity with [US GAAP]."

87.     In reality, the Financial Statements did *not* present fairly, in all material respects, the Company's financial position and results in conformity with US GAAP.    Rather, they violated GAAP because, *inter alia*, they provided inaccurate information about ShengdaTech, its resources, and the claims against those resources; omitted information that was material to the investment and

credit decisions of present and prospective investors and creditors; and presented information that was neither reliable nor complete. The Financial Statements violated at least the following GAAP principles:

    a)    that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (Financial Accounting Standards Board Statements ("FASB") Statement of Concepts No. 1, ¶ 40);

    b)    that financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);

    c)    that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibilities to owners for the use of enterprise resources entrusted to it -- to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

    d)    that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 58-59); and

    e)    that information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶¶ 79, 80).

88.     Hansen's audit report concerning the 2007 Financial Statements further stated, "in our opinion, ShengdaTech, Inc. and subsidiaries maintained, in all material respects, effective internal control over financial reporting ...." Similarly, KPMG HK issued a report to the Board and shareholders of ShengdaTech on March 15, 2010, stating that "[i]n our opinion, ShengdaTech,

36

Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009."[8]   These statements too were false.  As a result of Defendants' non-compliance with PCAOB standards, they failed to identify material weaknesses in the Company's internal controls, including weaknesses that enabled ShengdaTech management to surreptitiously divert corporate funds to their own personal use.

## VI.    DEFENDANTS' NEGLIGENCE AND BREACH OF CONTRACT CAUSED SHENGDATECH SUBSTANTIAL HARM

89.    In reliance on Hansen's and KPMG HK's unqualified opinions concerning the Company's financial statements and internal controls, ShengdaTech's Board: (a) caused the Company to include the Financial Statements in documents filed with the SEC and in offering documents submitted to potential investors, thereby unknowingly subjecting the Company to administrative penalties and potential civil and/or criminal liability; and (b) failed to discover and put a stop to Chen's and other ShengdaTech managers' absconding with corporate funds.

90.    If Defendants had performed their responsibilities competently and in conformity with US GAAP and the requirements of their engagement letters, the Board would have been alerted years earlier to the discrepancies and other issues that began coming to light in 2011, and would have taken remedial actions to prevent further defalcations of funds, cure any internal control deficiencies, and ensure the accuracy of the Company's financial reporting.  Instead, Defendants' negligence allowed the misconduct of ShengdaTech's management to go unchecked, allowing assets to continue to disappear, causing the Company to incur millions of dollars in investigatory, legal, and other expenses, subjecting the

[8] KPMG HK's opinion included the internal controls of all PRC Subsidiaries except Anhui Yuanzhong, which had been acquired during 2009.

1  Company to significant potential liability, and forcing the Company into

2  bankruptcy.

3      91.    For example, KPMG's discovery of "potentially serious

4  discrepancies and unexplained issues" in ShengdaTech's financial statements

5  forced the Board to form a Special Committee to investigate.    The Special

6  Committee hired O'Melveny (which was subsequently replaced by Skadden) and

7  PWC to conduct the investigation.    O'Melveny, Skadden, and PwC were

8  ultimately paid approximately $750,000, $690,000, and $1.4 million, respectively,

9  for their services.

10     92.    When the SEC served the Company with a subpoena for documents

11 in connection with its investigation in August 2011, ShengdaTech was forced to

12 expend time and money responding to this subpoena and dealing with the SEC's

13 investigation.

14     93.    On March 18, 2011, ShengdaTech was named as a defendant in a

15 securities fraud class action in the United States District Court for the Southern

16 District of New York, pending under the caption *Turner v. ShengdaTech, Inc., et*

17 *al.*, No. 11 Civ. 1918.    ShengdaTech was eventually dismissed from that case

18 following its bankruptcy filing, but it incurred costs and expenses defending itself

19 prior to that date.

20     94.    Further, ShengdaTech was forced to initiate five lawsuits in China in

21 an attempt to recover its assets.    Specifically, prior to the formation of the

22 Liquidating Trust, ShengdaTech filed five actions in China, as follows:  (1) an

23 action against several former officers of Shaanxi Haize Nanomaterials Co., Ltd.;

24 (2) an action against Chen Bo, the former general manager and legal

25 representative of Anhui Yuanzhong Nanomaterials Co., Ltd.; (3) an action against

26 Du Lei, the former general manager and former legal representative of Shandong

27 Haize Nanomaterials Co., Ltd.; (4) an action against Chen Xukui, the former

28 general manager and former legal representative of Shandong Bangsheng

1  Chemical Co., Ltd.; and (5) an action against several former officers of Zibo Jiaze

2  Nanomaterials Co., Ltd.  The Liquidating Trust continues to litigate these actions,

3  incurring substantial expenses.

4      95.    Perhaps most significantly, Defendants' misconduct prevented the

5  Board from learning in a timely manner that corporate assets were being stolen

6  from the Company.  Had they learned this information earlier, the Board could

7  have taken steps to prevent the theft of tens of millions of dollars in assets from

8  the Company.

9      96.    While Hansen's and KPMG HK's shoddy audit work caused

10  substantial damage to ShengdaTech, these auditors were paid handsomely for

11  their services.  Hansen was paid \$295,375 for auditing the 2007 Financial

12  Statements, and an additional \$45,000 for reviewing ShengdaTech's financial

13  statements for the first three quarters of 2008.  KPMG HK was paid \$395,314 and

14  \$685,584, respectively, for auditing the 2008 and 2009 Financial Statements.

15  Given the substantial harm incurred by ShengdaTech as a result of these botched

16  audits, ShengdaTech should not have been required to pay these substantial fees.

17  **VII.    TOLLING OF THE STATUTE OF LIMITATIONS**

18      97.    Under Section 108(a) of the Bankruptcy Code, the statutes of

19  limitations on Plaintiff's claims were tolled by ShengdaTech's August 19, 2011

20  bankruptcy filing.  Section 108(a) provides that, so long as the applicable statute

21  of limitations period for Plaintiff's claims "had not expired before the date of the

22  filing of the [bankruptcy] petition," Plaintiff may commence its actions before

23  "the later of (1) the end of such period …; or (2) two years after the order of

24  relief."  11 U.S.C. § 108(a).  The Liquidating Trust, as an agent of debtor in

25  possession ShengdaTech, is permitted to invoke the tolling applicable under

26  Section 108(a).

27      98.    None of the statutes of limitation on any of Plaintiff's claims had

28  expired prior to the filing of ShengdaTech's August 19, 2011 bankruptcy petition.

1  Pursuant to Section 108(a) tolling, Plaintiff has until at least August 19, 2013 to

2  timely file its claims.

3      99.   All of Plaintiff's claims have been brought within the applicable

4  statutes of limitations, after giving effect to tolling.

5  **VIII. CLAIMS FOR RELIEF**

6                    **FIRST CLAIM FOR RELIEF**
                    **Professional Negligence And Malpractice**

7                         **(Against Hansen)**

8      100.  Plaintiff repeats and realleges each and every allegation contained

9  above as if fully set forth herein.

10     101.  As ShendgaTech's auditor, Hansen owed ShengdaTech a duty to

11 exercise reasonable and professional care in providing audit and review services

12 to ShengdaTech, including the audit of the Company's 2007 Financial Statements

13 and internal controls and the review of the 2008 Quarterly Financial Statements.

14     102.  Hansen owed a duty to ShengdaTech to: (a) audit ShengdaTech's

15 2007 Financial Statements and internal controls and review ShengdaTech's 2008

16 Quarterly Financial Statements in accordance with US GAAS and in accordance

17 with all applicable professional and regulatory standards, including those of the

18 PCAOB; (b) exercise the skill and care normally possessed by members of the

19 accounting/auditing profession; (c) familiarize itself with ShengdaTech's

20 business, operations, accounting policies, business risks, internal controls

21 (including its information systems, financial controls, and monitoring), and

22 reporting methods; (d) plan and perform its audits to reduce audit risk to an

23 acceptably low level given its understanding of ShengdaTech's business and its

24 internal workings; (e) gather adequate and appropriate audit evidence and

25 critically assess the audit evidence upon which to base its audit reports and

26 finalize its audit reports pertaining to ShengdaTech's 2007 Financial Statements

27 only after it had conducted all appropriate audit procedures; (f) determine, based

28 upon sufficient audit evidence, whether there was significant doubt as to whether

ShengdaTech could continue as a going concern; (g) determine whether ShengdaTech's 2007 Financial Statements provided a true and fair view of ShengdaTech's financial position and of the results of its operations for the relevant period in accordance with US GAAP; (h) review the 2008 Quarterly Financial Statements to determine whether it was aware of any material modifications that should be made to these Financial Statements to ensure that they conformed with US GAAP; and (i) promptly alert ShengdaTech's Board as to the existence of: (A) material weaknesses or failures in the Company's internal controls; (B) inadequate management assessments or evaluations of controls; and (C) any irregularities, other illegal acts or identified fraud, or actions by insiders that are indicative of fraudulent financial reporting.

103.   Hansen negligently failed to discover that the 2007 Financial Statements and 2008 Quarterly Financial Statements were inaccurate and/or misleading, and that ShengdaTech management was diverting corporate funds to non-corporate uses.

104.   As a result of the acts and omissions set forth above, Hansen breached its duties to ShengdaTech by failing to exercise reasonable and professional care in auditing ShengdaTech's 2007 Financial Statements and internal controls and reviewing ShengdaTech's 2008 Quarterly Financial Statements, by generally failing to perform audit and review services for ShengdaTech in a professionally competent manner and in conformity with applicable regulatory and professional standards, and by issuing an unqualified audit opinion on the 2007 Financial Statements and internal controls when in fact the 2007 Financial Statements were materially misstated and did not comport with US GAAP.

105.   As a direct and proximate result of Hansen's wrongful conduct, ShengdaTech suffered damages, the amount of which shall be proven at trial.

106.  Plaintiff has the authority pursuant to the Plan of Reorganization and the Liquidating Trust Agreement to pursue this claim for recovery of damages suffered by ShengdaTech.

**SECOND CLAIM FOR RELIEF**
**Professional Negligence And Malpractice**
**(Against Baker Tilly Under The Doctrine Of *Respondeat Superior***
**Based On Hansen's Professional Negligence And Malpractice)**

107.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108.  This claim is brought by Plaintiff against Defendant Baker Tilly under the doctrine of *respondeat superior* based on Hansen's professional negligence and malpractice as alleged above.

109.  As alleged herein, ShengdaTech suffered damages as a direct and proximate result of professional negligence and malpractice committed by Hansen in auditing the 2007 Financial Statements and internal controls, in reviewing the 2008 Quarterly Financial Statements, and in issuing an unqualified audit opinion on the 2007 Financial Statements.

110.  Hansen was an agent of Baker Tilly with respect to its audits of the 2007 Financial Statements and internal controls, its reviews of the 2008 Quarterly Financial Statements, and its issuance of an unqualified audit opinion on the 2007 Financial Statements.  In connection with these activities, Hansen took actions at the behest of Baker Tilly, and such actions were within the scope of Hansen's agency.

111.  Under the principles of *respondeat superior,* Baker Tilly is responsible for the actions and liabilities of Hansen in connection with Hansen's negligence and malpractice.

112.  Plaintiff has the authority pursuant to the Plan of Reorganization and the Liquidating Trust Agreement to pursue this claim for recovery of damages suffered by ShengdaTech.

**THIRD CLAIM FOR RELIEF**
Professional Negligence And Malpractice
(Against KPMG USA And KPMG International
Under The Doctrine Of *Respondeat Superior* Based On
KPMG HK'S Professional Negligence And Malpractice)

113.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

114.  This claim is brought by Plaintiff against Defendants KPMG USA and KPMG International under the doctrine of *respondeat superior* based on KPMG HK's failure to exercise reasonable and professional care in auditing ShengdaTech's 2008 and 2009 Financial Statements and internal controls, reviewing the 2009 and 2010 Quarterly Financial Statements, and issuing unqualified audit opinions on the 2008 and 2009 Financial Statements.

115.  As ShendgaTech's auditor, KPMG HK owed ShengdaTech a duty to exercise reasonable and professional care in providing audit services to ShengdaTech, including the audits of the Company's 2008 and 2009 Financial Statements and internal controls and the reviews of the Company's 2009 and 2010 Quarterly Financial Statements.

116.  KPMG HK owed a duty to ShengdaTech to: (a) audit ShengdaTech's 2008 and 2009 Financial Statements and internal controls, and review ShengdaTech's 2009 and 2010 Quarterly Financial Statements, in accordance with US GAAS and in accordance with all applicable professional and regulatory standards, including those of the PCAOB; (b) exercise the skill and care normally possessed by members of the accounting/auditing profession; (c) familiarize itself with ShengdaTech's business, operations, accounting policies, business risks, internal controls (including its information systems, financial controls, and monitoring), and reporting methods; (d) plan and perform its audits to reduce audit risk to an acceptably low level given its understanding of ShengdaTech's business and its internal workings; (e) gather adequate and appropriate audit evidence and critically assess the audit evidence upon which to base its audit

reports and finalize its audit reports pertaining to ShengdaTech's 2008 and 2009 Financial Statements only after it had conducted all appropriate audit procedures; (f) determine, based upon sufficient audit evidence, whether there was significant doubt as to whether ShengdaTech could continue as a going concern; (g) determine whether ShengdaTech's 2008 and 2009 Financial Statements provided a true and fair view of ShengdaTech's financial position and of the results of its operations for the relevant period in accordance with US GAAP; (h) review the 2009 and 2010 Quarterly Financial Statements to determine whether it was aware of any material modifications that should be made to these Financial Statements to ensure that they conformed with US GAAP; and (i) promptly alert ShengdaTech's Board as to the existence of: (A) material weaknesses or failures in the Company's internal controls; (B) inadequate management assessments or evaluations of controls; and (C) any irregularities, other illegal acts or identified fraud, or actions by insiders that are indicative of fraudulent financial reporting.

117.  KPMG HK negligently failed to discover that the 2008 and 2009 Financial Statements and the 2009 and 2010 Quarterly Financial Statements were inaccurate and/or misleading, and that ShengdaTech management was diverting corporate funds to non-corporate uses.

118.  As a result of the acts and omissions set forth above, KPMG HK breached its duties to ShengdaTech by failing to exercise reasonable and professional care in auditing ShengdaTech's 2008 and 2009 Financial Statements and internal controls and in reviewing the 2009 and 2010 Quarterly Financial Statements, by generally failing to perform audit and review services for ShengdaTech in a professionally competent manner and in conformity with applicable regulatory and professional standards, and by issuing unqualified audit opinions on the 2008 and 2009 Financial Statements and internal controls when in fact the 2008 and 2009 Financial Statements were materially misstated and did not comport with US GAAP.

1    119.  As a direct and proximate result of KPMG HK's wrongful conduct,
2  ShengdaTech suffered damages, the amount of which shall be proven at trial.

3    120.  KPMG HK was an agent of both KPMG International and KPMG
4  USA with respect to its audits of the 2008 and 2009 Financial Statements and
5  internal controls, its reviews of the 2009 and 2010 Quarterly Financial Statements,
6  and its issuance of unqualified audit opinions on the 2008 and 2009 Financial
7  Statements.  In connection with these activities, KPMG HK took actions at the
8  behest of KPMG International and KPMG USA, and such actions were within the
9  scope of KPMG HK's agency.

10    121.  Under the principles of *respondeat superior*, KPMG International
11  and KPMG USA are responsible for the actions and liabilities of their agent,
12  KPMG HK, in connection with KPMG HK's negligence and malpractice.

13    122.  Plaintiff has the authority pursuant to the Plan of Reorganization and
14  the Liquidating Trust Agreement to pursue this claim for recovery of damages
15  suffered by ShengdaTech.

16                    **FOURTH CLAIM FOR RELIEF**
                      **Breach Of Contract**
17                    **(Against Hansen)**

18    123.  Plaintiff repeats and realleges each and every allegation contained
19  above as if fully set forth herein.

20    124.  In the course of Hansen's employment as an independent auditor by
21  ShengdaTech, Hansen entered into an Engagement Letter dated October 19, 2007
22  that described the services that Hansen was to provide to ShengdaTech.

23    125.  The Engagement Letter was a valid, enforceable contract.

24    126.  The Engagement Letter required Hansen to, among other things:

25          a.    conduct its "audits of the financial statements and internal
26    control … in accordance with the standards established by the Public
27    Company Accounting Oversight Board (PCAOB)";

28

                                    45

b.  "plan and perform the audit of the financial statements to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from errors, fraudulent financial reporting, misappropriation of assets, or violations of laws or regulations that are attributable to the Company or to acts of management or employees acting on the behalf of the Company";

c.  perform procedures including "tests of documentary evidence supporting the transactions recorded in the accounts, tests of physical existence of inventories, and direct confirmation of certain assets and liabilities by correspondence with selected customers, creditors and financial institutions"; and

d.  "review, in accordance with standards established by the Public Company Accounting Oversight Board, the condensed consolidated financial statements of the Company for the three month and year-to-date periods ended March 31, June 30, and September 30, 2008 ..."

127.  Hansen breached the terms of the Engagement Letter by, among other things: (1) failing to conduct its audit of ShengdaTech's 2007 Financial Statements and internal controls and its review of the 2008 Quarterly Financial Statements in accordance with the PCAOB standards; (2) failing to plan and perform its audit of ShengdaTech's 2007 Financial Statements to obtain reasonable assurance that those Financial Statements were free from material misstatements; (3) failing to perform procedures to support and verify the transactions recorded in ShengdaTech's accounts; and (4) failing to directly confirm ShengdaTech's reported cash balances with the relevant financial institutions and its transactions with its customers.

128.  Pursuant to the Engagement Letter, ShengdaTech paid Hansen $295,375 for auditing the 2007 Financial Statements and $45,000 for reviewing

ShengdaTech's 2008 Quarterly Financial Statements.    In all respects, ShengdaTech complied with the terms of the Engagement Letter.

129. As a direct and proximate result of Hansen's breach of the Engagement Letter, ShengdaTech suffered damages, the amount of which shall be proven at trial.

130. Plaintiff has the authority pursuant to the Plan of Reorganization and the Liquidating Trust Agreement to pursue this claim for recovery of damages suffered by ShengdaTech.

## FIFTH CLAIM FOR RELIEF
### Fraudulent Transfer
### (Against Hansen)

131. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

132. Plaintiff brings this claim against Hansen for fraudulent transfer pursuant to N.R.S. 112.180.1(b)(1), N.R.S. 112.180.1(b)(2), and N.R.S. 112.190.1.

133. During the four years prior to the filing of the Bankruptcy Proceeding, ShengdaTech paid (or caused its subsidiaries or affiliated companies to pay) Hansen fees for, among other things, auditing the Company's 2007 Financial Statements and reviewing the Company's 2008 Quarterly Financial Statements.

134. ShengdaTech did not receive reasonably equivalent value in exchange for the fees it paid (or caused to be paid) to Hansen. Among other reasons, as set forth at length herein, as a result of Hansen's negligence with respect to the services it provided to ShengdaTech, Company insiders were permitted to loot the Company for their own pecuniary gain, eventually causing the Company to collapse into bankruptcy.

135. As set forth at length above, during all times relevant hereto, ShengdaTech did not actually have the assets it reported on its books and records

1   and, upon information and belief, was insolvent at the time it paid Hansen (or
2   caused one of its subsidiaries of affiliated companies to pay Hansen) for its
3   services in, among other things, auditing and reviewing certain of the Company's
4   financial statements.

5        136.   Further, at the time ShengdaTech paid Hansen for these services (or
6   caused one of its subsidiaries or affiliated companies to pay Hansen),
7   ShengdaTech was engaged or was about to be engaged in a business or transaction
8   for which its remaining assets were unreasonably small in relation to the business
9   or transaction (including, for example, the 6.5% Notes Offering) and/or believed
10  or reasonably believed that ShengdaTech would incur debts beyond its ability to
11  pay as they came due.

12       137.   Under these circumstances, all fees paid to Hansen during the four
13  years prior to the filing of the Bankruptcy Proceeding amount to fraudulent
14  transfers and should be returned to Plaintiff.

15       138.   Plaintiff has the authority pursuant to the Plan of Reorganization and
16  the Liquidating Trust Agreement to pursue this claim for recovery of damages
17  suffered by ShengdaTech.

18  **IX.   PRAYER FOR RELIEF**

19       WHEREFORE, Plaintiff demands judgment on its behalf as follows:

20       A.   Awarding compensatory damages to Plaintiff, in an amount to be
21  determined at trial, together with prejudgment interest at the maximum rate
22  allowable by law;

23       B.   Ordering Defendants to disgorge to Plaintiff the fees and other
24  benefits they received in connection with their audits and reviews of
25  ShengdaTech's financial statements and internal controls;

26       C.   Awarding Plaintiff the costs of this suit, including reasonable
27  attorneys' and accountants' and experts' fees and other disbursements; and

28

1    D.    Awarding Plaintiff such other and further relief as this Court may

2  deem just and proper.

3  **X.    JURY TRIAL DEMANDED**

4    Plaintiff demands a trial by jury.

5

6  Dated:  August 15, 2013

7                                            */s/ John F. Murtha*
                                            John F. Murtha, Esq.
                                            Nevada Bar No. 835
8                                            Woodburn and Wedge
                                            6100 Neil Road, Suite 500
9                                            Reno, Nevada  89511
                                            Phone:  (775) 688-3016
10                                           Fax:      (775) 688-3088

11                                           Local Counsel For Plaintiff

12
                                            GRANT & EISENHOFER P.A.
13                                           Stuart M. Grant
                                            Megan D. McIntyre
14                                           Christine M. Mackintosh
                                            123 Justison Street
15                                           Wilmington, DE 19801
                                            Telephone:  (302) 622-7000
16                                           Facsimile:  (302) 622-7100

17                                           Counsel for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

49